### UNITED STATES of America, Plaintiff–Appellee,

v.

### Hartwell SCOTT, Defendant–Appellant.

### No. 94–2819.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 24, 1995.

Decided Feb. 16, 1995.

Rehearing and Suggestion for Rehearing En Banc Denied March 24, 1995.

Donna Eide and Judith A. Stewart (argued), Office of the U.S. Atty., Indianapolis, IN, for plaintiff-appellee.

R. Scott McFarland (argued), Muncie, IN, for defendant-appellant.

Before POSNER, Chief Judge, CUMMINGS and ROVNER, Circuit Judges.

CUMMINGS, Circuit Judge.

Hartwell Scott was convicted by a jury of four counts of drug trafficking and customs violations. The district court sentenced him to 88 months' imprisonment for marijuana on counts one and two, and 60 months' imprisonment for customs violations on counts three and four, concurrently, and a term of supervised release. On appeal, Scott argues that the prosecutor committed prejudicial error and denied Scott a fair trial by referring in closing arguments to Scott's failure to explain his story before trial. We affirm.

## I. FACTS

Customs officials in New York learned of a conspiracy to import marijuana from Jamaica into the United States between Renfred ("Bunny") Wright and Carlton Jackson. Jackson recruited young ladies in this country to visit Wright in Jamaica and return here with marijuana for Jackson to distribute. Hartwell Scott, a friend of Wright's and a corporal in the Jamaican national police force, occasionally flew to the United States to collect Wright's money. During 1992 and 1993, Scott flew to New York on three occasions to pick up from $10,000 to $16,000 cash from Jackson and deliver it to Wright in Jamaica. Jackson testified that he told Scott that the cash came from marijuana sales.

Jackson was arrested for drug trafficking and, pursuant to his plea agreement, cooperated with law enforcement officers to build a case against Scott and Wright. Jackson tele-phoned Wright in Jamaica and introduced Wright to "Tom Hinch," a cover name for a special agent with the United States Custom Service. Hinch had several conversations with Wright and the two agreed to import marijuana into the United States from Jamaica. Wright told Hinch that Scott would fly to Indiana to finalize the deal, and Hinch agreed to meet Scott at the airport.

On January 10, 1994, Hinch met Scott at the Indianapolis International Airport and the next day began two days of negotiations in a hotel room at the Ramada Inn to finalize the plan to import the marijuana. The hotel room was equipped with audio and video surveillance equipment. Scott discussed the retail price of the marijuana with Hinch and agreed to take care of security in Jamaica by paying the Jamaican police to stay away from the airfield while the marijuana was being loaded onto the plane. Hinch also took Scott to an airport at Eagle Creek, Indiana to meet two undercover Customs pilots, where Scott discussed with the pilots landing arrangements in Jamaica and provided a map of Jamaica.

On January 12, 1994, Hinch gave Scott $30,000 in cash, which Hinch represented to be proceeds from the sale of marijuana in Indiana, and drove Scott to Indianapolis International Airport. While Scott awaited departure to Jamaica, an airline employee announced the federal requirement that all persons departing the United States must report the transportation of more than ten thousand U.S. dollars to a Customs official. When the flight began boarding, Scott surrendered his boarding pass, walked past the uniformed Customs officer, and was arrested just before boarding the aircraft. Customs officers seized the $30,000 cash.

After receiving a *Miranda* warning, *see* 384 U.S. 436, 479, 86 S.Ct. 1602, 1630, 16 L.Ed.2d 694, Scott waived his right to an attorney and agreed to speak with the federal agents. Scott admitted to the agents that he came to Indianapolis to pick up money for Wright which he knew was the product of marijuana sales. Scott also admitted that he had made previous trips to the United States for Wright. Though Scott denied any involvement with the distribution of the mari-

juana, he admitted knowledge of the currency reporting requirements and that he had not reported travelling with currency on his prior trips to the United States.

Scott testified at trial that in the past he picked up money for Wright but under the belief that the money was to repay a loan from Wright to Jackson for motorcars. This action seemed appropriate to Scott because Wright did not have a travel visa and ran a taxi company, and Wright had loaned money to Jackson to pay Jamaican customs for cars which Jackson exported to Jamaica.

Scott then testified that he believed the purpose of this trip to the United States was to collect money from Hinch to pay for one of Wright's motorcars which had been damaged in an accident. Wright had told Scott that Hinch believed the money was part of a drug transaction, but that Wright did not and would not engage in drug transactions. Scott further testified that he expressed reservations to Wright, but that Wright assured him that no drugs were being transacted. Wright then instructed Scott to convince Hinch that the money was for drug smuggling in order to persuade Hinch to give Scott the money. Thus the videotapes of the discussions in the Ramada Inn hotel room represented Scott's efforts to convince Hinch that he was going to get one thousand pounds of marijuana, but in fact Scott provided Hinch with false information. During the visit to the airport, Scott testified that he also gave the agents false information to convince Hinch to hand over the money.

Finally, Scott testified that he had no prior knowledge of the customs form regarding the transportation of currency. At the airport, he did not hear the announcement informing passengers of the customs requirement and did not know of the requirement. Yet he also testified that he intended to fill out the form when he reached the plane.

During cross-examination, the government challenged Scott, "Now you never mentioned to Special Agent Hinkle this story you're telling us today, did you?" Scott claimed that he did not have time to mention it. No objection was made. During closing arguments, the prosecutor attempted to cast doubts on the veracity of Scott's testimony:

That leaves us then with Mr. Scott's pathetic defense, what it amounts to is, "Well, yeah, I intended to commit an offense, but not the one you have got me charged with; it was a different crime."

The most important thing to remember is, we didn't hear that story until he took the stand. Special Agent Hinkle didn't hear that story when [Scott] was interviewed. [Scott] had four months to come up with a story, and he sat there and listened to all of the evidence and saw how overwhelming it was, and he came up with really the only possible concoction he could. Implausible as it was, it was the only way he could get out of this because we have got so much evidence that all he could say was, "Well, I didn't mean—I wasn't intending to do what it appears I intended to do."

No objection was made during the closing argument. Scott now argues that this statement constituted prejudicial error in violation of *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976).

## II. DISCUSSION

■ Under *Doyle*, a prosecutor may not impeach a defendant by showing that his testimony at trial was inconsistent with his post-arrest silence after the defendant received his *Miranda* warnings. *Doyle* not only gives teeth to *Miranda*, but protects against the fundamental unfairness of allowing a government agent to assure a suspect that he has the right to remain silent, and then to use that silence as evidence against the person at trial. *Fletcher v. Weir*, 455 U.S. 603, 605, 102 S.Ct. 1309, 1311, 71 L.Ed.2d 490 (1982) (*quoting United States v. Hale*, 422 U.S. 171, 180, 95 S.Ct. 2133, 2138, 45 L.Ed.2d 99); *see also Brecht v. Abrahamson*, —— U.S. ——, ——, 113 S.Ct. 1710, 1717, 123 L.Ed.2d 353 (*Doyle* not merely a prophylactic).

However, when a defendant speaks to government agents after having received *Miranda* warnings, a prosecutor may impeach the defendant by pointing out the inconsistencies between the story he told to the police and the story he tells the jury.

*Anderson v. Charles,* 447 U.S. 404, 100 S.Ct. 2180, 65 L.Ed.2d 222 (1980). In this way, the prosecutor is not using a suspect's silence against him, but is demonstrating that what the suspect did say is at odds with his trial testimony.

 If a suspect does speak, he has not forever waived his right to be silent. *Miranda* allows the suspect to reassert his right to remain silent at any time during the custodial interrogation. *Miranda v. Arizona,* 384 U.S. 436, 445, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966). Thus a suspect may speak to the agents, reassert his right to remain silent or refuse to answer certain questions, and still be confident that *Doyle* will prevent the prosecution from using his silence against him. *United States v. Canterbury,* 985 F.2d 483, 486 (10th Cir.1993).

This is not such a case. Here Scott agreed to speak to the agents and then did not reassert his right to be silent or refuse to answer questions. Thus, Scott's "silence" consists of the omissions between his earlier version of the story and his trial testimony. "Such questioning makes no unfair use of silence because a defendant who voluntarily speaks after receiving *Miranda* warnings has not been induced to remain silent. As to the subject matter of his statements, the defendant has not remained silent at all." *Anderson,* 447 U.S. at 408, 100 S.Ct. at 2182.

Even if we were to find *Doyle* error, it would clearly be harmless beyond a reasonable doubt. *See Brecht,* —— U.S. at ——, 113 S.Ct. at 1722; *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967). The prosecutor's statement represented but one paragraph from ten pages of closing argument. The reference to Scott's post-arrest statements were thus limited in their intensity and frequency. Further, the quantum of evidence indicates Scott's guilt. Customs agents arrested Scott just prior to boarding the plane to Jamaica from Indianapolis International Airport with $30,000 in currency; Scott failed to file a customs report of the currency; "Hinch" testified that he and Scott discussed the sale of marijuana; Scott produced a map of Jamaica for the pilots who he believed would trans-port the marijuana; videotapes played for the jury showed Scott's marijuana discussions in the Indianapolis hotel room; Osbourne Dyer, the superintendent of the Jamaican Constabulary narcotics division, testified that Scott claimed to be sick during the time he flew to the United States and that Scott's duties as a police officer do not involve international drug trafficking; and Jackson testified that during Scott's prior trips to the United States Jackson told him that the cash came from the proceeds of marijuana sales.

AFFIRMED.