[No. B093741. Second Dist., Div. Four. Mar. 3, 1998.]

THE PEOPLE, Plaintiff and Respondent, v.
DALE RAY HURD, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

*Pursuant to rules 976(b) and 976.1 of the California Rules of Court, this opinion is certified for publication with the exception of the first paragraph under the heading Discussion, and parts III-V.

**COUNSEL**

Philip M. Brooks, under appointment by the Court of Appeal, for Plaintiff and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Carol Wendelin Pollack, Assistant Attorney General, John R. Gorey and Allison H. Ting, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

BARON, J.—

### RELEVANT PROCEDURAL HISTORY

On May 24, 1993, an information was filed charging appellant Dale Ray Hurd with the murder of Beatrice Hurd in violation of Penal Code section 187.[1] The information alleged as a special circumstance that the murder was intentionally carried out for financial gain (§ 190.2, subd. (a)), and that appellant personally used a firearm (§ 12022.5, subd. (a)). A first trial resulted in a hung jury and a mistrial.

Following a second trial, a jury found appellant guilty of first degree murder and found true the special circumstance allegation. Appellant was sentenced to life in prison without the possibility of parole plus four years, pursuant to section 12022.5, subdivision (a), to be served consecutively. Appellant appealed the judgment. We affirmed the judgment in an unpublished opinion on December 11, 1997.

In our original opinion we held that appellant did not invoke his right to silence when he refused to demonstrate the shooting and to take a polygraph examination. Thus, we held that the prosecution's use of appellant's refusals for impeachment purposes did not constitute *Doyle* error. (*Doyle* v. *Ohio* (1976) 426 U.S. 610 [96 S.Ct. 2240, 49 L.Ed.2d 91].) We granted appellant's petition for rehearing to consider whether appellant's refusal to perform the requested demonstration and to take the polygraph examination constituted a "limited" or "partial" invocation of his Fifth Amendment right to silence, and if so, whether *Doyle* prohibits use of that "limited" invocation against appellant. Upon reconsideration, we reissue our original opinion with the exception of parts I and II, which are modified to more fully address these issues.

### FACTUAL SUMMARY

*Prosecution Evidence*

Appellant and his wife, Beatrice (hereafter Bea), were married and had two children, Diana and Charlie, who were, respectively, eight and four

---

[1] All further statutory references are to the Penal Code unless otherwise stated.

years old when Bea was shot to death. Appellant, a Ph.D. in economics, earned $8,593 per month, while Bea earned $4,093 per month.

Bea had been fearful of guns since she was a little girl. During Bea's marriage to appellant, she told friends about her fear of guns.

In 1992, Diana and Charlie saw appellant with his knee bent around their mother's neck, choking her. They attempted to pull appellant's leg off Bea's neck and appellant eventually let go. On several occasions, Bea told her friend, Tobi Smith, of appellant's physical abuse and her fear of appellant's violent behavior. In February 1993, Bea also told Janice White, another friend, that appellant in 1990, while under the influence of alcohol, sat on Bea's chest and pounded her head into the floor.

Between late 1992 and early 1993, while appellant was out of town, Bea began a relationship with Paul Curley, a family friend. In February 1993, Bea started sessions with a licensed marriage counselor and expressed dissatisfaction of her "primary relationship/spouse" in a questionnaire, and her desire to separate from appellant. During the six counseling sessions prior to Bea's death, she disclosed appellant's physical abuse and her fear of appellant and of guns.

Bea separated from appellant in March 1993. Bea's attorney estimated her monthly support award would be between $2,800 and $3,300. In March 1993, appellant told his coworkers about his failing marriage and his discontent concerning his potential support payments. On April 1, 1993, appellant was served with dissolution papers.

On April 16, 1993, the day before Bea died, she took the children to appellant's house where they were going to spend the night. She planned to pick them up the next morning to take them to a swim meet.

The following day, Bea informed appellant by telephone that she intended to pick up the children. When Bea arrived, appellant went upstairs with a pile of typed papers. From upstairs, appellant yelled, "Bea come sign some papers." Charlie then heard a "big boom noise." Outside the house, Diana heard a gunshot and a scream. Bea hurriedly walked downstairs screaming and crying, and fell on the ground next to the front door. After she had stopped crying, appellant came downstairs and took Charlie to the car without stopping to help Bea. Appellant then called 911. The police officer who responded to the 911 call found appellant sitting motionless near the front entrance of the house and Bea's body lying at the foot of the entrance.

Bea died in the hospital from a gunshot wound to the chest fired from the gun found in appellant's bedroom dresser. Firearms experts testified that the

fatal shot was fired at a distance of between one and six inches. The bullet entered Bea's chest from left to right, front to back, and at a 35- to 40-degree downward angle, piercing the right atrium of the heart and exiting the body. Bea's face and scalp displayed abrasions and bruises that appeared to have been inflicted before her death.

*Defense Evidence*

Appellant testified in his own defense. He bought his first gun at age 16, and had owned the gun that killed Bea since 1985. After 1968, appellant had not fired a gun until the day Bea was shot and killed. Although Bea did not like guns, they always had guns in the house and she never indicated her "phobia" about guns. Although appellant had been "physical" with Bea during the marriage, they had just "grappled" and "wrestled." The incident the children saw was a game appellant played on the bed in which he would wrap his arms and legs around Bea and the children would "save" her.

With respect to the separation, appellant was unaware of Bea's relationship with Paul Curley. Although appellant tried to reconcile, Bea wanted a divorce. Appellant interviewed several attorneys but never hired one. Instead, appellant purchased a do-it-yourself divorce book and developed a spread sheet to determine his child support payment. While separated, appellant and Bea took the children to Disneyland for Charlie's birthday and later had dinner together at appellant's house.

On the day of the incident, appellant was watching the verdict in the first "Rodney King" trial when Bea came to pick up the children. Bea expressed concern about possible riots and appellant told her to take his gun. Appellant told Bea the gun was easy to use and tried to explain how to operate it. While standing in front of Bea, appellant attempted, with some difficulty, to load a round into the gun. As appellant lowered the gun while holding his finger on the trigger, it accidentally went off and shot Bea. Appellant, in shock, followed behind Bea as she walked downstairs. Appellant put Charlie in Bea's car and called 911.

DISCUSSION

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .*

I.

Appellant contends that his statement to police detectives, to the effect that Bea was considering getting a gun, was obtained in violation of

*See footnote, *ante*, page 1084.

his Fifth Amendment right against self-incrimination. Relying on *Miranda* v. *Arizona* (1966) 384 U.S. 436 [86 S.Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.3d 974], and *Doyle* v. *Ohio, supra,* 426 U.S. 610, appellant claims that his refusal to demonstrate the shooting and to submit to a polygraph examination constituted invocation of his Fifth Amendment right to silence. Accordingly, any subsequent statement obtained would be involuntary. We disagree.

■ After a defendant waives his or her *Miranda* rights, the police are free to interrogate until the defendant invokes his or her Fifth Amendment right to silence. (*People* v. *Randall* (1970) 1 Cal.3d 948, 955 [83 Cal.Rptr. 658, 464 P.2d 114], disapproved on other grounds in *People* v. *Cahill* (1993) 5 Cal.4th 478, 510 [20 Cal.Rptr.2d 582, 853 P.2d 1037].) A defendant may invoke his or her Fifth Amendment right to silence by refusing to continue an ongoing interrogation subsequent to waiving that right. (*People* v. *Ireland* (1969) 70 Cal.2d 522, 535 [75 Cal.Rptr. 188, 450 P.2d 580, 40 A.L.R.3d 1323].) Nevertheless, in *People* v. *Silva* (1988) 45 Cal.3d 604, 629-630 [247 Cal.Rptr. 573, 754 P.2d 1070], our Supreme Court held that a defendant may, during an ongoing interrogation, refuse to answer certain questions without manifesting a desire to terminate the whole interview.

■ In *Silva*, the defendant, who was charged with murder, waived his *Miranda* rights. He argued that his refusal to answer the interrogator's questions whenever they dealt with details of the homicide was sufficient to invoke his right to silence. The California Supreme Court disagreed and held that a defendant "may indicate an unwillingness to discuss certain subjects without manifesting a desire to terminate 'an interrogation already in progress.' [Citation.]" (*People* v. *Silva, supra,* 45 Cal.3d at pp. 629-630.)

The defendant in *People* v. *Davis* (1981) 29 Cal.3d 814 [176 Cal.Rptr. 521, 633 P.2d 186] also waived his *Miranda* rights and refused to take a polygraph examination. When he eventually agreed to take the test, he was silent when the polygraph administrator asked him several questions. The Supreme Court held that the defendant had not invoked his *Miranda* rights because ". . . although defendant's subsequent silence was clear evidence of his unwillingness to speak to the test administrator, the surrounding circumstances show that his reluctance was related only to the polygraph examination. Defendant initially refused to take the test; at the same time, however, he showed no hesitation to speak with the interrogating officers about all aspects of the case. In answering the test administrator's questions only with silence, defendant continued to demonstrate his reluctance to cooperate in

the administration of the test. He did not thereby assert that he was generally unwilling to discuss the case, but only that he was unwilling to submit to the scrutiny of the lie detector, a mechanical device." (*People* v. *Davis, supra,* 29 Cal.3d at p. 825.)

In our view, *Silva* and *Davis* are dispositive here. As in *Silva* and *Davis*, appellant waived his *Miranda* rights, and appellant never expressly indicated a desire to stop the interrogation. He continued to answer the detectives' questions regarding the homicide after his repeated refusal to demonstrate how the shooting occurred and to take a polygraph test. We therefore conclude that appellant's refusals to demonstrate the shooting and to undergo a polygraph test were insufficient to invoke his general right to silence.

Appellant also contends that the detectives used improper coercion through threats or promises, and thus his statement was involuntary and inadmissible. ■ Under the due process clause of the Fourteenth Amendment and article I, sections 7 and 15 of the California Constitution, an involuntary confession is inadmissible. An involuntary confession is one extracted by threats or violence or obtained by any direct or implied promise, however slight. (*People* v. *Benson* (1990) 52 Cal.3d 754, 778 [276 Cal.Rptr. 827, 802 P.2d 330].) " ' "[A]ny promise made by an officer . . . , express or implied, of leniency or advantage to the accused, if it is a *motivating cause* of the confession, is sufficient to invalidate the confession . . . ." ' . . ." (*People* v. *Ray* (1996) 13 Cal.4th 313, 339 [52 Cal.Rptr.2d 296, 914 P.2d 846], italics added, citations omitted.)

■ The record here does not support appellant's contention that his statements were involuntary. The detectives urged appellant to demonstrate the shooting and to take a lie detector test. Although they informed appellant of the murder charges pending against him, this was an accurate statement of appellant's situation. Because none of the detectives' statements indicated that the district attorney would act favorably in specific ways if appellant cooperated, they did not constitute impermissible promises of favorable action. (*People* v. *Higareda* (1994) 24 Cal.App.4th 1399, 1409 [29 Cal.Rptr.2d 763].) Finally, the detectives' comments were made to encourage appellant to take a polygraph test or provide a demonstration, and were unrelated to his statement regarding Bea's plan to get a gun. They were thus not the *motivating factors* of appellant's alleged involuntary statement. In our view, the trial court properly admitted the statement.

## II.

 Appellant also contends that the prosecutor committed *Doyle* error.[2] Appellant's "*Doyle* claim is based on the more limited assertion that his refusal to demonstrate the shooting or take a polygraph invoked his Fifth Amendment right *as to those specific areas,* and that accordingly, it was a denial of due process under *Doyle* for the prosecution to use, as evidence against him, his refusal to do the requested demonstration, because he was entitled under the Fifth and Fourteenth Amendments to refuse to do the demonstration without being penalized for his refusal."[3] (Original italics.)

 It is settled law that the prosecution may not, consistent with due process and fundamental fairness, use postarrest silence following *Miranda* warnings to impeach a defendant's testimony at trial. (*Doyle* v. *Ohio, supra,* 426 U.S. 610; *People* v. *Quartermain* (1997) 16 Cal.4th 600, 619 [66 Cal.Rptr.2d 609, 941 P.2d 788].) The *Doyle* rule arose in a case in which two defendants were advised of the right to remain silent, made no postarrest statements, and then testified at trial that they had been framed. On cross-examination, the prosecutor asked the defendants why they had not told the frameup story to the police upon their arrest. As the Supreme Court later explained, *Doyle* "concluded that such impeachment was fundamentally unfair because *Miranda* warnings inform a person of his right to remain silent and assure him, at least implicitly, that his silence will not be used against him. [Citations.]" (*Anderson* v. *Charles* (1980) 447 U.S. 404, 407-408 [100 S.Ct. 2180, 2182, 65 L.Ed.2d 222].)

 Appellant points to federal appellate courts that seem to have extended the *Doyle* rule. These cases, appellant argues, hold that ". . . when a defendant is 'partially silent' by answering some questions and refusing to answer others, this partial silence does not preclude him from claiming a violation of his due process rights under *Doyle.* [Citations.]" (*U.S.* v. *May* (10th Cir. 1995) 52 F.3d 885, 890, citing *U.S.* v. *Canterbury* (10th Cir. 1993)

---

[2]The Attorney General argues that appellant waived this issue by failing to interpose a timely objection when the *Doyle* error is alleged to have occurred and because appellant introduced the subject in his direct examination. As appellant points out, he contested both the admissibility of his refusals to do a demonstration, and the prosecution's proposed use of them to show consciousness of guilt, in both written and oral *in limine* motions before both his first trial and his second trial. Before his second trial began, the trial court ruled that all of the objections that he made prior to trial would be deemed made at trial as well, so that appellant would not have to continue raising them to protect his record. We find no waiver. (See *People* v. *Crittenden* (1994) 9 Cal.4th 83, 125-127 [36 Cal.Rptr.2d 474, 885 P.2d 887].) The prosecutor referred to appellant's refusal to demonstrate the shooting and played the tape recording of appellant's interview with the police in his opening statement. Thus, we do not find that appellant "opened the door" to discussion of his refusal to do the demonstration.

[3]The jury was not informed of appellant's refusal to take a polygraph test.

985 F.2d 483, 890 and *United States* v. *Harrold* (10th Cir. 1986) 796 F.2d 1275, 1279, fn. 3.)

In *U.S.* v. *Canterbury*, the defendant was advised of and waived his *Miranda* rights and answered three questions posed by the police regarding his possession of a silencer. At trial, the defendant raised an entrapment defense and the court permitted the prosecutor to question the defendant about his failure to tell the arresting officers that he had been "set up." The court held this was error because the cross-examination of the defendant was not designed to point out inconsistencies between the defendant's trial testimony and his statements at the time of arrest, but to draw attention to his postarrest silence. (*U.S.* v. *Canterbury, supra,* 985 F.2d at p. 486.)

In *U.S.* v. *May*, the record indicated that the defendant never formally invoked his right to remain silent. Instead, the defendant chose to tell various versions of his story to the authorities. The court held that even if the defendant partially invoked his right to remain silent, the prosecutor's comments did not constitute a violation of *Doyle* because, when viewed in context, the focus of the prosecutor's comments were on the defendant's prior inconsistent stories. (*U.S.* v. *May, supra,* 52 F.3d at p. 890.)

Similarly, in *U.S.* v. *Scott* (7th Cir. 1995) 47 F.3d 904, the court held: "Under *Doyle*, a prosecutor may not impeach a defendant by showing that his testimony at trial was inconsistent with his post-arrest silence after the defendant received his *Miranda* warnings." (47 F.3d at p. 906.) Thus, the *Scott* court concluded: "If a suspect does speak, he has not forever waived his right to be silent. *Miranda* allows the suspect to reassert his right to remain silent at any time during the custodial interrogation. [Citation.] Thus a suspect may speak to the agents, reassert his right to remain silent or refuse to answer certain questions, and still be confident that *Doyle* will prevent the prosecution from using his silence against him. [Citation.]" (47 F.3d at p. 907.) However, the court found no *Doyle* error because the defendant agreed to speak to the officers and then did not reassert his right to be silent or refuse to answer questions.

We take a somewhat different view. A defendant has no right to remain silent selectively. Once a defendant elects to speak after receiving a *Miranda* warning, his or her refusal to answer questions may be used for impeachment purposes absent any indication that such refusal is an invocation of *Miranda* rights. Here, appellant talked freely and voluntarily about his relationship with his wife and how the shooting occurred including drawing a diagram. By refusing the demonstration, appellant in effect said, "I'll tell you, but I won't show you." Appellant cannot have it both ways. Appellant

was not induced by the *Miranda* warning to remain silent. Having talked, what he said or omitted must be judged on its merits or demerits, and not on some artificial standard that only the part that helps him can be later referred to.[4]

This was not a case where the prosecution commented upon a prior exercise of rights. The prosecutor asked the jury to measure what appellant said and refused to do. We do not think *Doyle* was meant to preclude the prosecutor from commenting on highly relevant evidence bearing on appellant's credibility, including appellant's refusal to provide critical details, when he had voluntarily waived his right to remain silent. In sum, we conclude that *Doyle* error was not here committed as there was no evidence that appellant's refusal to demonstrate the shooting or take a polygraph was based upon an invocation of his *Miranda* rights.

III.-V.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . .

DISPOSITION

The judgment is affirmed.

Epstein, Acting P. J., and Hastings, J., concurred.

A petition for a rehearing was denied March 24, 1998, and appellant's petition for review by the Supreme Court was denied June 10, 1998. Kennard, J., was of the opinion that the petition should be granted.

---

[4]We note that this is not a case from which it can be inferred that by advising appellant of his right to remain silent, the authorities implied that appellant's refusal to show the detectives how the shooting occurred could not be used against him. (See *Anderson* v. *Charles, supra,* 447 U.S. at pp. 407-408 [100 S.Ct. at pp. 2181-2182].) Appellant was repeatedly warned by the officers that his refusal to show them how the shooting occurred would be commented upon to the jury.

*See footnote, *ante,* page 1084.