Filed 9/25/13  P. v. Rezac CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> STEPHAN REZAC, <br><br> Defendant and Appellant. | F064139 <br><br> (Super. Ct. No. F10903531) <br><br> **OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  Hilary A. Chittick, Judge.

Ron Boyer, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Kathleen A. McKenna and Amanda D. Cary, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

A jury found appellant Stephan Rezac guilty of inflicting corporal injury on a cohabitant (Pen. Code,[1] § 273.5, subd (a)); battery resulting in serious bodily injury (§ 243, subd. (d)); assault by means of force likely to produce great bodily injury (§ 245, subd. (a)(4)); false imprisonment (§ 236); and destroying a wireless communication device (§ 591.5).  Sentencing enhancement allegations for personal infliction of great bodily injury were found to be true.  The trial court imposed a prison sentence of seven years and eight months.

Rezac appeals the judgment on grounds of ineffective assistance of counsel, claiming his trial attorney failed to object to violations of the rule articulated in *Doyle v. Ohio* (1976) 426 U.S. 610 (*Doyle*) which prohibits questions or comments by the prosecution about a defendant's invocation of the right to remain silent.  Rezac further alleges instructional error in the trial court's use of CALCRIM No. 852, which he claims resulted in a violation of his constitutional due process rights.

Reversal of the judgment is also sought pursuant to a theory of cumulative error.  Finally, Rezac contends the trial court was obligated to stay his sentence under the false imprisonment conviction pursuant to section 654.  We find no grounds for reversal under any of these claims and affirm the judgment in its entirety.

## FACTUAL AND PROCEDCURAL BACKGROUND

On July 12, 2010, Rezac phoned the Fresno County Sheriff's Department and told the dispatcher, "I'm calling to report a domestic dispute…please send an ambulance." He provided his name and age (56), along with the name and age of the person in need of medical attention (L.R., age 41).  As Rezac responded to the dispatcher's inquiries, L.R. could be heard in the background saying, "Somebody help me…. Somebody help me…." At one point Rezac said, "We're fine."  L.R. interjected, "I'm not fine…He's beating

---

[1] All statutory references are to the Penal Code.

2.

me… He beat me." Rezac assured the dispatcher he was not beating L.R., but alluded to a mutual altercation that had already occurred.

Rezac admitted hitting L.R. He also told the dispatcher, "It's my fault. It's each of our fault. (sic) She got the end of it." When asked if weapons were involved, Rezac said no and claimed to have unloaded a shotgun that was in the house out of fear L.R. might shoot him.

Deputy Christopher Tullus was dispatched to L.R.'s home in response to Rezac's phone call. He found Rezac and L.R. waiting outside in the driveway. Rezac walked up to him and said, "We got into a fight. She got the worst of it. I did it." Rezac had no visible injuries except for red marks around one of his elbows.

The deputy immediately noticed L.R.'s eyes were purple and swollen shut. She was bleeding, hysterical, and appeared to be in pain. L.R. accused Rezac of harming her and demanded that he be arrested. Rezac was detained and moved to a patrol car as additional law enforcement officers and medical personnel began to arrive. He was placed under the supervision of another sheriff's deputy, Deputy Richardson, who advised Rezac of his *Miranda*[2] rights.

Deputy Tullus looked through L.R.'s house while paramedics attended to her outside. He found blood splattered on multiple surfaces throughout the home and smeared next to a hole in the wall at the end of a hallway. A broken cell phone was located in the kitchen. Sherriff's deputies photographed the interior of the house and took pictures of L.R.'s face.

The victim was taken by ambulance to Community Regional Medical Center where she remained hospitalized for approximately three days. Doctors found clinical signs of a basilar skull fracture in addition to C5 and C6 spinous process fractures, a left

---

[2] *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

nasal bone fracture, lacerations on her face and left ear, and bruises all over her body. L.R. wore a neck brace for approximately six weeks and subsequently underwent three surgeries to repair a detached retina and other injuries to her left eye.

On October 25, 2010, the Fresno County District Attorney filed a criminal information charging Rezac with infliction of corporal injury on a cohabitant (Count 1), battery resulting in serious bodily injury (Count 2), making criminal threats (§ 422; Count 3), assault by means of force likely to produce great bodily injury (Count 4), false imprisonment (Count 5), assault with a firearm (§ 245, subd. (a)(2); Count 6) and disabling a telephone line (§ 591; Count 7). Count 7 was later amended to a misdemeanor charge of destroying a wireless communication device (§ 591.5). The information contained sentencing enhancement allegations under section 12022.7, subdivision (e), for personal infliction of great bodily injury.

A jury trial commenced in October 2011. L.R. testified as a prosecution witness, providing background information about her relationship with Rezac and details of the relevant events. The two began dating in approximately September 2009. Rezac moved into L.R.'s home in November 2009 and continued living there until July 2010. According to L.R., the romantic aspect of the relationship deteriorated in January 2010 but she allowed Rezac to continue living with her while he saved money for a place of his own. By July, the relationship had turned hostile.

On or about July 6, 2010, L.R. delivered a written eviction notice to Rezac's place of employment. Rezac took a trip out of town a few days later. He departed on a Friday afternoon and was back in Fresno by Monday, July 12, 2010.

Rezac came home from work on Monday at around 8:00 p.m. and quickly went out again to get dinner. At some point L.R. discovered Rezac had spent the weekend with a female companion. She found photographic evidence of this online and also learned the woman's name and telephone number. While Rezac was out getting dinner,

4.

L.R. called the woman and cautioned her about getting involved with him. L.R. told her Rezac was verbally abusive and advised that she not let him move in with her.

Rezac returned home at approximately 8:30 p.m., at which point L.R. confronted him about his female companion. She said, "I know you've got pictures. Why don't you show me the good time that you had." Rezac denied the accusation and refused L.R.'s repeated requests to see his camera.

A physical confrontation ensued after L.R. retrieved Rezac's camera from another room. He placed her in a "bear hug" and punched her in the face. L.R. broke free and ran to the front door. As she attempted to unlock the door, Rezac dragged her backwards and threw her to the ground. He then got on top of L.R. and choked her with his arm, saying that he was going to kill her. Next, as L.R. attempted to get up from the floor, Rezac kicked her repeatedly in the head, neck and upper body.

L.R. later described being in the kitchen (she could not remember how she got there) and informing Rezac that she had contacted his female companion. He responded by punching her in the face. L.R. attempted to dial 911 on her cell phone but Rezac snatched the phone out of her hand and broke it in half. Realizing her eyes were beginning to swell, L.R. said she wanted to go to the bathroom to remove her contact lenses. Rezac objected, telling her, "I'm not going to let you go back there because you'll get the gun and shoot me with it."

Rezac eventually escorted L.R. to the bathroom but slammed her body into a wall along the way. The impact created a hole. Rezac left her alone momentarily and went off to retrieve a shotgun which she kept in her bedroom. He allegedly pointed the weapon at L.R. and said, "Do you want to know what it feels like to be shot and killed?" L.R. replied, "Please don't. I have children. Please don't kill me." Rezac kept the gun pointed at L.R. for four or five minutes before saying, "I'm going to unload it for your sake and for mine." He removed the shells from the shotgun, then punched L.R. several

more times while in the bathroom and again upon their return to the kitchen. Finally, after nearly two hours of fighting, Rezac called the sheriff's department.

Rezac's trial counsel insinuated that L.R. was intoxicated when she sustained her injuries. An alcohol screening conducted at Community Regional Medical Center revealed a blood alcohol level of only 0.03 percent. However, a toxicology expert for the defense opined that L.R.'s blood alcohol level was probably closer to 0.08 percent at 8:30 p.m., i.e., around the time she started fighting with Rezac. Toxicology results from the hospital also showed the presence of benzodiazepines, referring to a category of anti-anxiety drugs such as Valium.

L.R. admitted drinking two beers over the course of approximately two hours, roughly between 5:30 p.m. and 7:30 p.m. She denied ingesting any drugs except for her thyroid medication, but said the paramedics may have given her benzodiazepines on the way to the hospital. Sheriff's Deputy Richard Coningsby testified that L.R. did not appear to be intoxicated at the time of Rezac's arrest.

Deputy Coningsby took a statement from L.R. before she departed from the scene and subsequently interviewed her at the hospital. She recounted a version of events that was generally consistent with her trial testimony, including details of how Rezac had punched, kicked, and choked her. L.R. reportedly told Deputy Coningsby that no firearms were used during the altercation and confirmed Rezac had unloaded the shotgun while she was in the bathroom. L.R. explained on cross-examination that her statement to Deputy Coningsby was only meant to indicate that no firearms were discharged.

Rezac testified in his own defense. He described arriving home on July 12, 2010 at approximately 7:30 p.m. and informing L.R. of his plans to move out of her house the following day. The news upset L.R., who shouted at Rezac as he went into his bedroom to avoid further interaction with her. He stayed in his room until approximately 9:00 p.m. and then left the house to get dinner.

6.

Rezac returned home to find L.R. angry and aggressive. She screamed, "I know you went on a trip. I've seen pictures and know who you were with." Rezac tried to defuse the situation by offering to "sit down and talk about it." L.R. continued yelling and attempted to look through a bag of his personal belongings. As Rezac pulled the bag away, L.R. started swinging at him and yelling, "I want to see the pictures!"

Failing to gain access to his bag, L.R. grabbed Rezac's cell phone and said, "I'm going to check your phone…I'm going to call all these people and I'm going to ruin your life. I'm going to call every client and tell them what an asshole you are. I'm going to ruin everything you've got." As L.R. scrolled through his phone, Rezac positioned himself behind her, placed her in a "bear hug," and said, "Stop. This is not necessary." L.R. leaned forward, catching him off balance, and body slammed Rezac to the ground.

Rezac's eyeglasses came off of his face when he hit the floor. As he searched for the glasses, L.R. said that she needed to "pee" and headed towards the bathroom. Rezac soon heard a "big noise," which he believed was the sound of L.R. tripping over a rug and falling to the floor. Rezac went to investigate and tripped over the same rug, falling on top of L.R. in the process. L.R. was crying and moaning, but instructed Rezac to leave her alone when he asked if she was hurt.

Rezac resumed searching for his glasses and found them bent in half. As he was bending the frames back into shape, L.R. yelled, "I'm going to fucking kill you" and took off running down the hallway. Fearing L.R. intended to retrieve a firearm, Rezac chased and caught up with her. Their feet got tangled as Rezac grabbed ahold of L.R.'s dress, which caused both of them to trip and fall. L.R.'s face hit the wall "really, really hard" as she fell over.

Rezac found the shotgun and unloaded it. Meanwhile, L.R. entered the bathroom and continued screaming at him. Rezac denied pointing the gun at L.R. or threatening her with it in any way. Once the weapon was unloaded, he approached L.R. and suggested that she remove her contact lenses. L.R. responded by swinging her arms

wildly and hitting him. Rezac slapped L.R. once in the face as she continued to attack him.

L.R. eventually calmed down and the couple relocated to the kitchen. A period of approximately ten minutes elapsed as they sat together quietly. L.R. stood up to get a drink of water but tripped over her chair and fell into a sliding glass door. When Rezac picked up the fallen chair, L.R. suddenly became aggressive and started kicking him. He lost his balance and accidently swung the chair downward onto the left side of L.R.'s face.

L.R. became further agitated and once again threatened to call Rezac's friends and business associates. Rezac reacted by attempting to destroy his cell phone, but mistakenly broke L.R.'s cell phone instead. Once he realized that his own phone was still functional, he used it to call the sheriff's department.

The jury returned guilty verdicts as to Counts 1, 2, 4, 5, and 7, and found the enhancement allegations for personal infliction of great bodily injury to be true with respect to Counts 1 and 4. Rezac was acquitted of assault with a firearm as alleged under Count 6. Juror deadlock resulted in a mistrial on the Count 3 charge of making criminal threats. Count 3 was later dismissed at the time of sentencing.

Rezac was sentenced to a total prison term of seven years and eight months. Using Count 1 as the principal term, the trial court imposed the middle term of three years, plus a consecutive four-year term pursuant to the section 12022.7 enhancement. The same sentence was imposed for Count 4, but stayed pursuant to section 654. The middle term of three years was imposed for Count 2 and stayed pursuant to section 654. Rezac was sentenced to an additional term of 8 months under Count 5, representing one third of the middle term. No additional punishment was imposed for the misdemeanor conviction under Count 7, as Rezac was given credit for time served. This timely appeal followed.

8.

## DISCUSSION

### I. Claims of Error Related to Rezac's Post-*Miranda* Silence

#### A. Background

During cross-examination, Rezac acknowledged that despite post-arrest conversations with colleagues and family members, he never explained the cause of L.R.'s injuries to anyone prior to taking the stand at trial. The prosecution reminded the jury of this testimony during closing argument while contending that Rezac's version of events was inconsistent with the evidence in the record. The following comments were made without objection from defense counsel:

"He is telling you this story of this woman who can't even walk through her own home. She's tripping on rugs and falling into walls and hitting the sliding glass door because she gets her foot caught up in a chair. He never told anyone until yesterday that the way that she sustained these injuries is by falling.

"This is unreasonable in several different respects. The first being he told you he talked to his parents. He told you he called his boss, who is his friend, from booking. It is unreasonable to believe that someone would want their loved ones to remain believing that they could do this to a person. He would want to absolve himself of guilt, not just in a criminal sense, but so the people he cared about would not think that he was capable of this. But he didn't discuss the details with them, he said.

"The other reason why this is unreasonable or the other reason that you can consider that it is untrue is because he's had 15 months to sit and think of that story, a story he's never told anyone until yesterday. [L.R.] didn't have that much time. She gave a statement to deputies while bleeding, while suffering from pain, and her story has been consistent the whole time. His story that he told you yesterday, he had 15 months and the benefit of listening to the preliminary hearing testimony before he ever mentioned those things."

9.

Although defense counsel never raised the issue, the trial court subsequently cautioned the prosecution to be mindful of the rules under *Doyle*, *supra*, regarding comments about a defendant's post-*Miranda* silence. The court was uncertain whether *Doyle* error had actually occurred, but advised the prosecution not to revisit such arguments during rebuttal. The issue did not come up again until after the jury reached its verdict.

Defense counsel filed a post-verdict motion for new trial based upon allegations of *Doyle* error. The trial court denied the motion and stated the basis for its decision on the record: "First, the grounds are waived because there was no objection made to the [closing] argument by counsel…Second, it seems to the court this is arguably not *Doyle* error and the court is finding that it is not *Doyle* error, because there is no evidence that [Rezac's] failure to tell anyone his version was motivated by *Miranda*…Next, pre-*Miranda* silence is clearly admissible. In this case we have statements on [the] 911 [call] and to the responding law enforcement that to the court's mind are inconsistent with the version of events that Mr. Rezac gave at trial and, therefore, it just seems to the court that it's perfectly appropriate for the People to argue that and, in effect, that is what they did. Finally, it does seem to the court that even if this is considered to be *Doyle* error, it is harmless, because the weight of the evidence in this case is overwhelming against Mr. Rezac …".

B. Applicable Law

In *Doyle*, the United States Supreme Court held that "the use for impeachment purposes of [a defendant's] silence, at the time of arrest and after receiving *Miranda* warnings, violate[s] the Due Process Clause of the Fourteenth Amendment." (*Doyle*, *supra*, 426 U.S. at p. 619, fn. omitted.) The case involved two defendants who exercised their right to remain silent after being arrested and given *Miranda* warnings. The defendants testified at trial, offering an exculpatory story to explain and refute the prosecution's evidence. On cross-examination the prosecutor asked the defendants why,

10.

if they were innocent, they did not provide their explanation to law enforcement at the time of their arrest. (*Id*. at pp. 612-615.) This form of impeachment was held to be fundamentally unfair since the *Miranda* warnings provide implicit assurances to an arrestee that there will be no penalty for invoking the right to remain silent. (*Id*. at p. 618.)

Subsequent case law has limited the application of *Doyle* in certain contexts. For example, in *Anderson v. Charles* (1980) 447 U.S. 404 (*Anderson*), the Supreme Court clarified that *Doyle* does not apply to cross-examination about prior inconsistent statements which contain discrepancies or omissions of pertinent facts. (*Anderson* at p. 408.) "Each of two inconsistent descriptions of events may be said to involve 'silence' insofar as it omits facts included in the other version. But *Doyle* does not require any such formalistic understanding [of the concept of silence]." (*Id*. at p. 409.)

If a defendant presents exculpatory testimony at trial that is inconsistent with earlier voluntary statements about the crime, the inconsistencies may be highlighted on cross-examination. (*People v. Collins* (2010) 49 Cal.4th 175, 203 (*Collins*).) "Such questioning makes no unfair use of silence, because a defendant who voluntarily speaks after receiving *Miranda* warnings has not been induced to remain silent. As to the subject matter of his statements, the defendant has not remained silent at all." (*Anderson, supra,* 447 U.S. at p. 408.) Furthermore, *Doyle* does not apply to a defendant's pre-*Miranda* silence, whether such silence occurs before an arrest (*People v. Earp* (1999) 20 Cal.4th 826, 856-857) or after custodial detention (*People v. Delgado* (1992) 10 Cal.App.4th 1837, 1841).

In *People v. Eshelman* (1990) 225 Cal.App.3d 1513 (*Eshelman*), the Second District Court of Appeal observed that "*Doyle* and the majority of the cases interpreting it concern a defendant's post[-]arrest failure to explain his conduct to the *police*." (*Id*. at p. 1520, original italics.) Only a small number of published cases have addressed the test for *Doyle* error when a defendant refrains from providing information about a crime to a

private citizen.  The *Eshelman* opinion offers guidelines for the latter scenario.  *Doyle* applies when the evidence demonstrates that a defendant's silence in front of a private party resulted primarily from the conscious exercise of his or her constitutional right against self-incrimination and/or entitlement to counsel.  (*Ibid.*)

Failure to object on *Doyle* grounds and request a curative admonition results in a forfeiture of *Doyle* error claims.  (*People v. Tate* (2010) 49 Cal.4th 635, 691-692; *Collins, supra,* 49 Cal.4th at p. 202.)  Conceding that his trial attorney did not assert the necessary objections to preserve the issue for appeal, Rezac characterizes those omissions as ineffective assistance of counsel.  The applicable standard of review requires us to presume defense counsel rendered adequate assistance and exercised reasonable professional judgment.  (*People v. Carter* (2003) 30 Cal.4th 1166, 1211; *People v. Holt* (1997) 15 Cal.4th 619, 703.)  It is Rezac's burden to refute this presumption and establish a reasonable probability that, but for his counsel's unprofessional errors, he would have received a more favorable outcome at trial.  (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1126.)

   C.  <u>There Are No Grounds For Reversal</u>

The performance of Rezac's trial counsel must be evaluated by determining whether the prosecution's questions on cross-examination and/or comments during closing argument constituted *Doyle* error.  (*People v. Hollinquest* (2010) 190 Cal.App.4th 1534, 1555 (*Hollinquest*).)  The record does not disclose the existence of such error.

"'Absent evidence of complicity on the part of law enforcement officials, the admissions or statements of a defendant to a private citizen infringe no constitutional guarantees.'"  (*In re Eric J.* (1979) 25 Cal.3d 522, 527, quoting *People v. Mangiefico* (1972) 25 Cal.App.3d 1041, 1049.)  Applying this rule in conjunction with the Supreme Court's decision in *Anderson*, *supra*, we conclude that cross-examining Rezac about his post-arrest, post-*Miranda* conversations with private parties did not violate the *Doyle* rule.  *Anderson* holds that a defendant who voluntarily speaks to another person after

receiving *Miranda* warnings has effectively chosen to forego his right to remain silent as to the subject matter of his statements. (*Anderson*, *supra*, 447 U.S. at p. 408.) It was permissible for the prosecution to ask Rezac what he said to his co-workers and family members about the underlying incident in order to determine whether any admissions or prior inconsistent statements had been made. No questions were asked concerning why Rezac did or did not disclose certain information during those conversations.

As to the propriety of the prosecution's closing argument, Rezac was subject to the potential consequences of voluntarily discussing aspects of his case outside the confines of an attorney/client relationship. "A defendant has no right to remain silent selectively. Once a defendant elects to speak after receiving a *Miranda* warning, his or her refusal to answer questions may be used for impeachment purposes absent any indication that such refusal is an invocation of *Miranda* rights." (*People v. Hurd* (1998) 62 Cal.App.4th 1084, 1093.) There is nothing in the record to indicate that Rezac refused to answer specific questions about his fight with L.R., but there is also no evidence that his silence on the topic was a conscious invocation of his Fifth Amendment rights.

In *Eshelman*, *supra*, the prosecution attempted to draw an adverse inference from a defendant's post-arrest silence which occurred during conversations with his girlfriend. (*Eshelman*, *supra*, 225 Cal.App.3d at pp. 1518-1519.) The defendant testified that his refusal to respond to the girlfriend's questions about the underlying murder was partially attributable to the fact that his attorney instructed him not to speak with her before trial. (*Id*. at p. 1519.) The appellate court concluded *Doyle* error had occurred because the defendant clearly exhibited "reliance on his constitutional rights to silence and counsel." (*Eshelman*, *supra*, 225 Cal.App.3d at p. 1521.)

On the opposite end of the spectrum is *People v. Medina* (1990) 51 Cal.3d 870 (*Medina*). There, an incarcerated defendant's silence in the face of his sister's questions during a jail visit was allowed to be used against him because the record did not suggest that he believed his conversation was being monitored or that his silence was intended to

13.

be the invocation of a constitutional right. The sister's inquiries went directly to the question of his guilt ("Why did you have to shoot those three poor boys?"). (*Medina*, *supra*, 51 Cal.3d at pp. 889-890.) There was also a lack of evidence in the record to show the defendant had been given *Miranda* warnings prior to his sister's visit. (*Ibid*.)

In the more recent case of *Hollinquest, supra,* the prosecutor introduced evidence that the defendant, while conversing with a friend during a jail visit, discussed his case without mentioning the underlying murder or his connection to an individual who had confessed to participating in the killing. (*Hollinquest*, *supra*, 190 Cal.App.4th at pp. 1541-1542, 1545, 1554.) The defendant's post-*Miranda* silence occurred during telephone calls that were interrupted by periodic warnings that the calls were being recorded. (*Id*. at p. 1557.) In light of this fact, the appellate court found there was at least some indication that the defendant consciously exercised his constitutional right to remain silent. (*Ibid*.) The court ultimately found that even if *Doyle* error had occurred, the error was harmless. (*Id*. at pp. 1560-1561.)

The facts of this case are different from those in *Eshelman*, *Medina,* and *Hollinquest*. While some comparisons may be drawn with *Hollinquest*, the defendant in that case did not testify at trial and was never subjected to potential impeachment for making prior inconsistent statements. (*Hollinquest*, *supra*, 190 Cal.App.4th at p. 1557.) The debatable existence of *Doyle* error was due to the prosecutor telling the jury that it could find the defendant's silence indicated "a consciousness of guilt." (*Id*. at p. 1558.)

Here, the focus of the prosecution's argument was on Rezac's explanation that L.R.'s injuries were caused by a series of random mishaps attributable to her own actions. The intent was to convince the jury that Rezac's story was an elaborate fabrication which he developed over a period of time. There was no direct attempt to have the jury draw an inference of guilt from his exercising the right to remain silent, nor evidence that Rezac consciously invoked that right while speaking with friends and family. The latter point is critical. As a general rule, "'[r]ecent fabrication may be inferred when it is shown that a

witness did not speak about an important matter at a time when it would have been natural for him to so.'" (*People v. Riccardi* (2012) 54 Cal.4th 758, 803.) The prosecution not only commented upon Rezac's post-*Miranda* behavior, but also pointed out that he made statements of admission prior to his arrest, yet withheld the innocent explanation for L.R.'s injuries. In the absence of evidence showing Rezac affirmatively invoked his Fifth Amendment rights, the prosecution's arguments were logical and permissible given the context in which they were made.

California cases addressing issues of post-*Miranda* silence in the private party context have followed the test set forth in *Eshelman*: "*Doyle* need not apply to [a] defendant's silence invoked [in the presence of] a private party absent a showing that such conduct was an assertion of his rights to silence and counsel. [Citation.] On the other hand, when the evidence demonstrates that defendant's silence in front of a private party results primarily from the conscious exercise of his constitutional rights, then *Doyle* should apply." (*Eshelman*, *supra*, 225 Cal.App.3d at p. 1520.) The *Eshelman* test is not novel. It merely applies a well-established principle to a particular set of circumstances. (See *People v. Preston* (1973) 9 Cal.3d 308, 315 ["The Fifth Amendment privilege against self-incrimination does not on its face apply to commentary on defendant's nonassertive conduct prior to trial, absent a showing that such conduct was in assertion of the privilege to remain silent."].)

The record does not demonstrate that Rezac's failure to discuss certain details of the crime with his colleagues and family members was a conscious invocation of his Fifth Amendment rights. We are essentially asked to assume his intentions in that regard. To do so would contravene traditional standards of appellate review. Error will not be presumed. (*People v. Garcia* (1987) 195 Cal.App.3d 191, 198.) Given that all presumptions and intendments favor the judgment, Rezac has the burden of supplying an adequate record to show that error occurred; any ambiguities in the record are resolved

15.

against him.  (*People v. Malabag* (1997) 51 Cal.App.4th 1419, 1422-1423; *People v. Green* (1979) 95 Cal.App.3d 991, 1001.)  His burden has not been met.

*Doyle* error does not occur where the prosecutor's reference to a defendant's post-arrest silence constitutes "a fair response to defendant's claim or a fair comment on the evidence."  (*People v. Champion* (2005) 134 Cal.App.4th 1440, 1448.)  Here, the prosecution's arguments were made within the larger context of pointing out inconsistencies between Rezac's trial testimony and his pre-*Miranda* statements of admission to law enforcement, as well as discrepancies concerning the nature of L.R.'s injuries and the manner in which he claimed they occurred.  Although the prosecutor may have treaded close to the line which divides *Doyle* error from permissible argument, we are not convinced the line was crossed.

Even if the conduct at issue could be considered a *Doyle* violation, we would conclude any error was harmless beyond a reasonable doubt.  (See *Chapman v. California* (1967) 386 U.S. 18; *People v. Thomas* (2012) 54 Cal.4th 908, 936-937.)  The harmless error analysis focuses on "what the jury actually decided and whether the error might have tainted its decision.  That is to say, the issue is 'whether the … verdict actually rendered in *this* trial was surely unattributable to the error.'"  (*People v. Neal* (2003) 31 Cal.4th 63, 86.)

L.R.'s testimony concerning the cause of her injuries was credible, consistent, and plausible.  Her version of the events was corroborated by contemporaneous statements at or near the time of the incident, as evidenced by the transcript of Rezac's call to the sheriff's department, and further corroborated by the deputies who spoke with her that evening.  Rezac, on the other hand, made highly incriminating statements of admission prior to his arrest that were not the product of interrogation and, therefore, not violative of *Miranda* or *Doyle*.  (*People v. Mickey* (1991) 54 Cal.3d 612, 648; *People v. Mobley* (1999) 72 Cal.App.4th 761, 792, disapproved on another ground in *People v. Trujillo* (2006) 40 Cal.4th 165, 181, fn. 3.)

16.

The sheriff's department's dispatcher asked Rezac, "Did you hit her?" He responded, "Yeah, I did...I did…Yes, I did…It's my fault. It's each of our fault. She got the end of it." When the deputies arrived, Rezac said, "We got into a fight. She got the worst of it. I did it." Rezac evidently impeached himself in the minds of the jury by telling a story at trial that was inconsistent with his prior statements and, to put it kindly, less plausible than L.R.'s version of the events.

Rezac contends prejudice is evident from his acquittal on the charge of assault with a firearm, the mistrial on the charge of making criminal threats, and "the fact that the jury did not readily arrive at a verdict." This is not a well-reasoned argument. If anything, the outcome shows the jury was willing to accept a portion of his testimony despite the prosecutor's comments during closing argument, but nevertheless found his story unbelievable with respect to the cause of the severe injuries sustained by L.R. Accordingly, and in light of the strong evidence of Rezac's guilt, we find that the probative value of the prosecution's comments was de minimis. It is clear beyond a reasonable doubt that Rezac would have been found guilty of the crimes for which he was convicted absent the alleged *Doyle* violation. Therefore, reversal is not warranted on the basis of ineffective assistance of counsel or any other grounds.

## II. Constitutionality of CALCRIM No. 852

During the prosecution's case-in-chief, Rezac's ex-wife took the stand and testified about prior uncharged acts of domestic violence allegedly committed by him during their marriage. Relevant to the ex-wife's testimony, the trial court instructed the jury using CALCRIM No. 852, "Evidence of Uncharged Domestic Violence."[3] Rezac

---

[3] The instruction was as follows:

"The People presented evidence that the defendant committed domestic violence that was not charged in this case, specifically: acts as alleged by [Rezac's ex-wife]. *Domestic violence* means abuse committed against an adult who is a former spouse. *Abuse* means intentionally or recklessly causing or attempting to cause bodily injury, or

17.

contends the use of this instruction violated his constitutional right to due process by allowing the jury to find by only a preponderance of evidence that he committed uncharged prior acts of domestic violence, and then to infer his guilt as to the currently charged offenses based on his commission of the prior acts. In other words, Rezac believes CALCRIM No. 852 effectively lowered the prosecution's burden of proof.

Respondent correctly notes that the arguments advanced by Rezac have been rejected by the appellate courts on several occasions. CALCRIM No. 852 is similar to CALJIC No. 2.50.01, which also relates to the manner in which juries can consider evidence of uncharged acts, specifically prior sexual offenses. In *People v. Reliford* (2003) 29 Cal.4th 1007, 1016 (*Reliford*), the California Supreme Court rejected a challenge to the constitutionality of CALJIC No. 2.50.01 that was based upon due process arguments similar to those presented in Rezac's briefs. Relying upon the *Reliford* decision, the Third District Court of Appeal reached the same conclusion

---

placing another person in reasonable fear of imminent serious bodily injury to himself or herself or to someone else.

You may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant in fact committed the uncharged domestic violence. Proof by a preponderance of the evidence is a different burden of proof from proof beyond a reasonable doubt. A fact is proved by a preponderance of the evidence if you conclude that it is more likely than not that the fact is true. If the People have not met this burden of proof, you must disregard this evidence entirely.

If you decide that the defendant committed the uncharged domestic violence, you may, but are not required to, conclude from that evidence that the defendant was disposed or inclined to commit domestic violence and, based on that decision, also conclude that the defendant was likely to commit and did commit [Counts 1 through 7], as charged here. If you conclude that the defendant committed the uncharged domestic violence, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of [Counts 1 through 7]. The People must still prove each [count] of every charge beyond a reasonable doubt. Do not consider this evidence for any other purpose."

regarding the constitutionality of CALCRIM No. 852 in *People v. Reyes* (2008) 160 Cal.App.4th 246, 250-253 (*Reyes*). The Third District also rejected a similar due process challenge to CALCRIM No. 852 in *People v. Johnson* (2008) 164 Cal.App.4th 731, 738-740 (*Johnson*).

Rezac insists his arguments are distinct from those which failed in cases such as *Reliford*, *Reyes,* and *Johnson*. The distinction supposedly lies in his characterization of evidence pertaining to uncharged prior acts of domestic violence as "circumstantial," and his focus on the level of proof required to establish the underlying circumstances. The thrust of the claim is that constitutional due process requires a defendant's commission of prior acts of domestic violence to be proven beyond a reasonable doubt (as opposed to by a preponderance of the evidence) before the jury can consider the prior acts as circumstantial evidence of the defendant's guilt vis-à-vis the currently charged offenses. His argument fails.

In *People v. Carpenter* (1997) 15 Cal.4th 312 (*Carpenter*), the California Supreme Court considered the standard of proof to be applied to evidence of uncharged crimes. Noting that "[t]he United States Supreme Court, interpreting the Federal Rules of Evidence, has adopted the preponderance standard," the *Carpenter* opinion holds that the "preponderance of the evidence standard adequately protects defendants. Once the other crimes evidence is admitted, whatever improper prejudicial effect there may be is realized whatever standard is adopted. If the jury finds by a preponderance of the evidence that [the] defendant committed the other crimes, the evidence is clearly relevant and may therefore be considered." (*Carpenter*, at pp. 380-382.)

Rezac fails to cite *Carpenter* in his briefs, but in a footnote acknowledges an earlier case, *People v. Medina* (1995) 11 Cal.4th 694, 762-764, as "superficially contrary authority" to his position. We note that the California Supreme Court recently cited favorably to both *Medina* and *Carpenter* in the opinion of *People v. Rogers* (2013) 57 Cal.4th 296 (*Rogers*), which contains the following statement: "It is well settled that

19.

evidence of other crimes presented in the guilt phase of a criminal trial may be proved by a preponderance of the evidence." (*Rogers*, *supra*, 57 Cal.4th at p. 338.) Pursuant to these California Supreme Court cases and the authorities discussed above, we find no error in the trial court's use of CALCRIM 852. Rezac's cumulative error argument necessarily fails as well.

### III. Application of Penal Code Section 654

Rezac contends the trial court erred by failing to stay the sentence for the false imprisonment conviction under Count 5 pursuant to section 654. We disagree.

Section 654 prohibits multiple punishments for crimes arising out of a single act or indivisible course of conduct. (*People v. Hester* (2000) 22 Cal.4th 290, 294.) The statute provides, in pertinent part: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." (§ 654, subd. (a).) The defendant's intent and objective, rather than the "temporal proximity of his offenses," determines whether two crimes are part of an indivisible course of conduct. (*People v. Harrison* (1989) 48 Cal.3d 321, 335.)

The applicability of section 654 "is a question of fact for the trial court, which is vested with broad latitude in making its determination. Its findings will not be reversed on appeal if there is any substantial evidence to support them. We review the trial court's determination in the light most favorable to the respondent and presume the existence of every fact the trial court could reasonably deduce from the evidence." (*People v. Jones* (2002) 103 Cal.App.4th 1139, 1143, citations omitted.)

The trial court offered no insight into its decision not to stay sentence under Count 5 except to say it believed false imprisonment was "essentially a separate offense" in relation to the other convictions. Viewing the record in the light most favorable to the judgment, there is sufficient evidence to support multiple explanations for the court's

20.

finding. The evidence shows some of Rezac's violent acts in Counts 1, 2, and/or 4 occurred prior to behavior upon which the false imprisonment conviction could have been based. One could reasonably infer Rezac's intent and objective in falsely imprisoning L.R. was not to facilitate further violence, but rather to prevent potential consequences of her escape such as attracting public attention to the incident, her retrieval of a weapon, or the involvement of law enforcement. Substantial evidence thus supports the trial court's finding that Rezac harbored multiple criminal objectives and engaged in separate criminal acts rather than an indivisible course of conduct. The trial court did not err in refusing to apply section 654 to Count 5.

## **DISPOSITION**

The judgment is affirmed.

_____
Gomes, Acting P.J.

WE CONCUR:

_____
Kane, J.

_____
Detjen, J.