Filed 1/12/24  P. v. Reyes CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>STEVEN JOSEPH REYES,<br><br>Defendant and Appellant. | F084152<br><br>(Super. Ct. No. F21902147)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  Alvin M. Harrell III, Judge.

Scott Concklin, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Darren K. Indermill, and Catherine Tennant Nieto, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

# INTRODUCTION

Almost 50 years ago, the United States Supreme Court held that it was a violation of due process and fundamental fairness to use a defendant's postarrest silence following *Miranda*[1] warnings to impeach a defendant's trial testimony. (*Doyle v. Ohio* (1976) 426 U.S. 610, 617–618 (*Doyle*); see *Griffin v. California* (1965) 380 U.S. 609, 615, fn. omitted (*Griffin*) ["[T]he Fifth Amendment … forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt."].) Defendant Steven Joseph Reyes was interrogated post-*Miranda* warnings and remained mostly silent when confronted by law enforcement with the victim, A.P.'s[2] sexual assault allegations. During the trial, an audio recording of the interrogation was played for the jury; the jury was instructed with CALCRIM No. 357 (Adoptive Admissions); and the prosecutor told the jury, during both her closing and rebuttal arguments, defendant had the opportunity to deny the allegations made against him, but "[h]e chose not to say anything at all."

After the jury was instructed and told it could consider defendant's post-*Miranda* silence as an adoptive admission of guilt, it convicted him of two counts of sexual intercourse or sodomy with A.P., a child 10 years of age or younger (Pen. Code, § 288.7, subd. (a), counts 1 & 2),[3] and two counts of oral copulation or sexual penetration with A.P., a child 10 years of age or younger (§ 288.7, subd. (b), counts 3 & 4). Subsequently, defendant was sentenced to two indeterminate terms of 50 years to life, and two indeterminate terms of 30 years to life, for a total aggregate sentence of 160 years to life.

On appeal, defendant raises numerous errors associated with his interrogation. Defendant contends: (1) "[i]t was error to instruct the jury with CALCRIM No. 357

---

[1]     *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

[2]     Pursuant to California Rules of Court, rule 8.90, we refer to some persons by their first names or initials. No disrespect is intended.

[3]     All further references are to the Penal Code unless otherwise indicated.

because [his] silence cannot be reasonably characterized as an adoptive admission, but was instead an exercise of his *Miranda* rights"; (2) "[i]t was also improper for the [trial] court to inform the jury that [his] conversation with [the d]etective supported the adoptive admission instruction"; and (3) "[i]t was misconduct for the prosecutor to comment on [his] post-arrest, post-*Miranda* silence and to argue, over objection, that such silence served as an adoptive admission of guilt .…"

We conclude both the trial court and the prosecutor erred in violation of *Doyle* and *Griffin*, and we further find defendant was prejudiced by the trial court instructing the jury with CALCRIM No. 357, along with the prosecutor's subsequent references to his silence during her closing and rebuttal arguments. We therefore reverse the judgment.[4]

## STATEMENT OF CASE

On May 10, 2021, the Fresno County District Attorney filed an information charging defendant with two counts of sexual intercourse or sodomy with A.P., a child 10 years of age or younger (§ 288.7, subd. (a), counts 1 & 2), and two counts of oral copulation or sexual penetration with A.P., a child 10 years of age or younger (§ 288.7, subd. (b), counts 3 & 4). As to all offenses, the information further alleged a prior strike offense for robbery (§§ 667, subds. (b)–(i), 1170.12, subds. (a)–(d), 211). On September 7, 2021, a jury found defendant guilty on all counts. Defendant admitted the prior strike offense for robbery.

On February 9, 2022, trial counsel filed a motion for a new trial. Specifically, trial counsel argued "[t]he court erroneously provided the jury with [CALCRIM No.] 357, the adoptive admission instruction, in violation of [defendant's] right to remain silent under custodial questioning by law enforcement, after finding that part of defendant's interview by law enforcement officials was done without first being advised of his *Miranda*

---

[4] Defendant raises other claims as set forth in part II. of the Discussion, but we do not reach the merits of those claims.

Rights." On March 4, 2022, after hearing argument from both trial counsel and the prosecutor, the trial court denied the motion finding "insufficient evidence to grant the Motion for a New Trial ...." The trial court then set the matter for sentencing.

Subsequently, as to count 1, the trial court sentenced defendant to an indeterminate term of 25 years to life, doubled to 50 years to life because of the strike prior. As to count 2, the trial court sentenced defendant to an indeterminate term of 25 years to life, doubled to 50 years to life because of the strike prior, to run consecutive to count 1. As to count 3, the trial court sentenced defendant to an indeterminate term of 15 years to life, doubled to 30 years to life because of the strike prior, to run consecutive to count 1. As to count 4, the trial court sentenced defendant to an indeterminate term of 15 years to life, doubled to 30 years to life because of the strike prior, to run consecutive to count 1. The total aggregate sentence imposed was 160 years to life.

## SUMMARY OF FACTS

### I. The Prosecution Case-in-chief

In 2017, A.P.'s mother (Amy) moved with her two children A.P. and O.P. to a house in Reedley—the same city where her mother (Carmen) and Carmen's husband (David) lived. Both A.P. and O.P. were born with disabilities and Carmen assisted in taking care of them.

In December 2017, defendant was released from custody and began living with Amy, A.P., and O.P. Defendant and Amy continued their ongoing sexual relationship. Carmen liked defendant and testified he "was good with [A.P.] … [a]nd [A.P.] … enjoyed his company."

#### A. Carmen's Testimony

At the end of A.P.'s third grade year, Amy told Carmen A.P. "was using her hands to stimulate herself … [¶]… [¶] [and] would go into a little closet in their house and take care of business." During this time, defendant was staying at the house off and on, but "was down with them … once or twice a week at least during the summer …."

4.

Subsequently, during the summer before A.P.'s fourth grade year, A.P. "would come over [to Carmen's house] a lot of weekends and spend the night and she would— when it was time to go, she would just cry and beg [Carmen] not to make her go back." During A.P.'s fourth grade year, when she was nine years old, A.P.'s teacher told Carmen "[A.P.] was humping the floor." Carmen observed this behavior at her home. Specifically, Carmen testified:

> "[A.P.] would go back into the [play]room and close the door, and when I would go check on her, she would be laying face down, her hands between her legs and she—this is where the grunting was coming in, so it all started to, you know, make some sense. And I would ask her why she was doing that, of course, she didn't know what to say and she didn't know. And I asked her, you know, how she learned to do that. You know, she didn't know."

On December 6, 2019, A.P. disclosed to school psychologist, Patty Mendoza, that she had been sexually abused. Carmen then picked up A.P. and O.P. from school and drove them to the police station for an interview. At the police station, Detective Vasquez interviewed A.P. while Carmen was present in the interview room. During the interview, A.P. told Detective Vasquez, "So, [defendant] did touch me." Specifically, she said defendant touched her two times and that she was scared defendant would have to go back to jail.

Days later, Carmen discovered A.P. was "taking pictures of herself naked in interesting positions" and also found a video of A.P. that she described as looking like porn. She also "started finding poop places in the house, primarily her bedroom[] [a]nd it got so bad she actually shared with her therapist that she would put her finger up her butt, and scoop out poop, and her desire was to flick it and put it all over the walls …." A.P. also made herself throw up all over the carpet and would shove her finger up her nose, causing her nose to bleed, and then blow snot out the other side of her nose.

Finally, Carmen testified she did not tell A.P. or O.P. what to say during their statements or testimony, but rather only to "just be truthful and just tell [their] story."

5.

**B.      A.P.'s Testimony**

A.P. was born in 2010 and was 11 years old at the time of the trial.  She testified via one-way closed circuit television.  She promised to tell the truth, but did tell the trial court she was "[s]cared and nervous."  A.P. testified she was eight years old and in the third grade when defendant moved into the house.  Defendant "ha[d] a bunch of tattoos everywhere on him" and he "slept with [her] mom," Amy.  A.P. testified that when defendant initially moved into the house "[h]e was nice, really nice.  He always [took her and O.P.] to stores and g[ot] [them] candy."

One day, A.P. walked into Amy and defendant's bedroom to cuddle with Amy.  "When [A.P.] walked in, [she] didn't know [Amy and defendant] were doing sex, and [she] didn't know that."  Amy got mad at A.P.  A.P. then got into the bed and Amy "took her underwear off and her leg was up, and … [defendant] grabbed [A.P.'s] hand and made [her] put it in [Amy's] butt, and [she] smelled [her] hand.  It was weird, and … [she] didn't like it."  A.P. tried to leave, but defendant said, "'Stay,' and [she] was like, 'Oh,' and [she] had to say, 'Fine,' but—and then [she] wanted to go out again and then he still wouldn't let [her] go out."  Subsequently, defendant "told [her] to get on top of him." She had to touch his "[p]enis."  She described defendant's penis as "hairy."[5]  Defendant then grabbed A.P.'s hand "and he told [her] to cup it, and [she] smelled [her] hand, and it … [¶] … [¶] … smelled gross."

A.P. then testified that defendant "laid down … and he … he wanted [her] to take [her] underwear off and [her] pants.  [Her] butt wasn't clean, and he started licking it [her] butt and [her] vagina."  She described it as feeling "like a dog licking [her]."  A.P. then went to the bathroom and "when [she] was going to the bathroom, [defendant] told [her] to leave the door open[] [when she] was going pee, and he took a video of [her] going pee."

---

[5]      She also described defendant's penis as "look[ing] red, like—like—like [her] brother's."

6.

In a separate incident,[6] when A.P. was either eight or nine years old, defendant made her kiss him on the lips while she was in the bathroom. She described the kiss as "just wet." A.P. also testified that while she was in the bathroom, defendant "put his penis inside [her]," but did acknowledge she was not sure he "put it inside [her]" because "[i]t would hurt if it was in [her]." She testified she "was wearing some short—skirts."

During cross-examination, A.P. described an incident where defendant put his fingers up her vagina and "butthole." Specifically, she testified the incident occurred inside Amy and defendant's bedroom during the day. Defendant was "wearing pants," while A.P. "was wearing a t-shirt and shorts." He was lying down and he used one hand and "put his fingers inside [A.P.'s] butthole, and it started hurting." She testified he "put his fingers kind of in deep, not all the way deep but a little deep" and A.P. described it as "[w]eird and hurt." During this incident, defendant told A.P. "to keep it a secret." As to all these incidents, A.P. testified she did not practice her testimony with Carmen before going to court.

A.P. further testified she knew about porn and stated "[p]orn is sex." Defendant made her watch porn on his phone and described one video where "there's two girls that are licking a boy's penis." She watched porn with defendant multiple times. Defendant also told A.P. "he would be [her] boyfriend and marry [her]" and to "keep this a secret." After testifying, A.P. was physically brought into the courtroom and identified defendant as the individual she described during her testimony.

### C.    O.P.'s Testimony

O.P. was 12 years old at the time of trial. O.P. testified he lived with his mother (Amy) and defendant[7] for approximately three years before moving in with Carmen on

---

[6]    A.P. testified she believed these incidents "happened on different days."

[7]    O.P. was unable to identify defendant in court, but referenced defendant by his first name throughout his testimony.

December 4, 2019. He recalled times when A.P. would go into the bedroom while defendant and Amy were inside the room. He testified "the door was locked" and that she had to go into the room because "[defendant] said so." At one point, O.P. observed both Amy and defendant lying on the bed naked. He observed defendant's penis. Later on, A.P. told O.P. that defendant "F-U-C-K-E-D" her.

### D. The Multi-disciplinary Interview Center (MDIC) Interview[8]

On January 2, 2020, Caroline Dower-Serrano, a forensic interview specialist, interviewed A.P. A.P. told Dower-Serrano she was nine years old and in the fourth grade. A.P. promised to tell the truth and if she did not understand a question, she agreed to respond, "I don't know .…" She also indicated she "was really nervous to talk about [defendant]."

#### 1. *First Incident*

During the first incident, when A.P. was nine years old, she knocked on Amy and defendant's bedroom door and they said, "'[G]et away.'" She insisted and "they said[,] 'okay, come in[]' and then they started doing sex … in the … in the room." Amy and defendant were also watching porn, but A.P. hid because she "didn't want to see it." Subsequently Amy and defendant started having sex, and A.P. observed Amy "biting his penis."[9] Amy then went to sleep. Defendant then "told [A.P.] to lick it and then he told [her] to do like what [her] momma was doing." She started "biting [defendant's] penis," which she described as "wet." A.P. said it "hurt[] [her] tooth." Eventually, Amy woke up and saw A.P. oral copulating defendant. Amy "got really mad and threw [A.P.] out of the room." A.P. "got so angry that [she] threw glass."

---

[8] During the interview, A.P. told Dower-Serrano about three separate incidents of abuse. However, A.P. went back and forth in describing the three incidents.

[9] The People introduced the video recording of the MDIC interview as People's exhibit No. 2. To describe the act of biting a penis, A.P. made an oral copulation motion with her head.

### 2. *Second Incident*

During the second incident, A.P. was in bed with both defendant and Amy, when Amy got up to get coffee for herself and defendant. Defendant then "told [A.P.] to get on him and [she] said[,] '[U]h fine.' And then he told [her] … he told [her] to kiss him, and [she] didn't want to .…" He then "put his whole fingers inside [A.P.'s] private, like inside the middle and then in the butthole." A.P. got up and went to the bathroom, and defendant walked in, closed the door, and started kissing her. He then "put his penis … inside [her]." He "was rubbing [her] legs and then his hand … [his] whole fingers in [her] butthole and then [her] vagina." She said "[i]t really hurt[]." Defendant then "licked [her] private and then he told [her] to … bite his penis but [she] didn't want to." A.P. started bleeding. Amy found out about A.P.'s injuries and took her to the hospital.

### 3. *Third Incident*

Further, A.P. described a third incident of abuse. She told Caroline she "was in third grade … and [she] was nine and then when [defendant] … came home from Prison he was touching [her] a lot and then he told [her] to kiss him and then touch his penis and [she] didn't want to." He also placed his fingers inside her vagina and "butthole."

### E. Posttraumatic Stress Disorder (PTSD) Evidence

Cynthia Reyes worked as "a clinician with Uplift Family Services." She worked with A.P. as her therapist since late December 2020. She testified regarding PTSD. Specifically, she testified that PTSD occurs when "[a]fter a traumatic incident that a person has either witnessed or directly experienced, they're left with … traumatic symptoms or behaviors .…" She further testified that A.P. exhibited symptoms and behaviors consistent with PTSD.

### F. Child Sexual Assault Accommodation Syndrome (CSAAS) Evidence

Psychologist Anna Washington provided a description regarding CSAAS evidence. Specifically, Washington explained CSAAS as follows:

"So there are five different components to CSAAS, and they are secrecy, helplessness, entrapment and accommodation, delayed, unconvincing and conflicting disclosures and retraction or recantation, and these five components, again, describe common behaviors that we might see in children who have been sexually abused, and they're also describing things that people often have misconceptions about, and we know it's not really a cookie cutter type of a format, so some of these factors can apply to some of the children, but all of them don't have to apply to every victim of child sexual abuse, and so there's some variability in how children may respond to sexual abuse."

She continued to explain that CSAAS "is not meant to be a diagnostic tool or a means of determining whether or not sexual abuse has occurred," but rather it "helps explain behaviors of children who have been sexually abused."

## II.     The Defense Case-in-chief

### A.     Defendant's Testimony

Defendant took the stand and testified in his defense. He was 47 years old at the time of trial and has five biological children. Defendant testified he lived in Squaw Valley up until the time of his arrest. He would drive to Amy's house once a month to visit his daughter, granddaughter, and dogs, except when his car was inoperable from July to November 2019.

Defendant further testified he had no romantic or sexual relationship with Amy. However, he admitted to sleeping in the same bed with Amy, but stated he never had sex with her, nor was he ever naked with her. Finally, he testified all the allegations made against him were false.

### B.     District Attorney Investigator Lorena Jimenez's Testimony

On April 23, 2021, Fresno County District Attorney Investigator Lorena Jimenez interviewed Carmen by telephone. Carmen told Jimenez that she had asked A.P. in the car, "'So tell me, if they ask you what happened, can you tell me what you might say?'" Further, Carmen told Jimenez about a time when Detective Vasquez had come over to her house to view videos of A.P. on a tablet. Carmen then emailed the videos to Vasquez

10.

and deleted them off the tablet. Lastly, on July 30, 2021, Jimenez interviewed O.P., and O.P. told her that A.P. had said defendant "fucked" her. However, O.P. told Jimenez that Carmen had told him to say that.

### C. Character Witnesses

Daniel P. testified he had employed defendant for five years and described him as "completely trustworthy, [a] great employee." He further testified he never observed defendant act inappropriately towards his grandchildren and "there's no way in [his] mind that he would be part of anything like this."

Further, both defendant's brother, Paul R., and Paul R.'s wife (Monica R.) testified they never had concern with having defendant around their children. Monica also testified she did not believe defendant and Amy were romantically involved.

### D. Medical Evidence

On December 23, 2019, Nurse Practitioner Janie Salazar examined A.P. as a possible "victim of sexual abuse." She testified her vaginal and anal examinations were normal. However, she also testified its more likely to find evidence of sexual assault if the child is examined within 24 hours of the assault, and that 95 percent of the time no physical findings are found.

## III. The Prosecution Rebuttal

On January 15, 2020, defendant was arrested following a vehicle stop. The People played a recording of this exchange for the jury. During the exchange, Detective Vasquez asked defendant, "Are you at all sorry for doing what you did to [A.P.]? Huh?"; defendant said nothing.

**DISCUSSION**

**I.   Both the Trial Court and the Prosecutor Committed *Doyle/Griffin* Error by Instructing the Jury It Could Rely on Defendant's Post-*Miranda* Silence as Substantive Evidence of Guilt**

Defendant contends:  (1) "[i]t was error to instruct the jury with CALCRIM No. 357 because [his] silence cannot be reasonably characterized as an adoptive admission, but was instead an exercise of his *Miranda* rights"; (2) "[i]t was also improper for the [trial] court to inform the jury that [his] conversation with Detective Vasquez supported the adoptive admission instruction"; and (3) "[i]t was misconduct for the prosecutor to comment on [his] post-arrest, post-*Miranda* silence and to argue, over objection, that such silence served as an adoptive admission of guilt …."**10**

The People contend that defendant "forfeited this [*Doyle* error] claim by failing to object on that ground below."  However, the alleged *Doyle* error only became evident once the prosecutor requested for the jury to be instructed with CALCRIM No. 357, which allowed the jury to use defendant's silence as evidence of guilt.  This request occurred *after* Detective Vasquez had testified.  As we discuss in detail below, defendant's post-*Miranda* waiver statements were still admissible and, thus, it is reasonable to presume trial counsel had no issue with defendant's statements being admitted into trial through Vasquez's testimony.  (See *Berghuis v. Thompkins* (2010) 560 U.S. 370, 381 (*Berghuis*); see also *Davis v. United States* (1994) 512 U.S. 452, 459 (*Davis*).)  With that being said, during the jury instruction conference, and immediately after the prosecutor requested the adoptive admission instruction, trial counsel objected to

---

**10**      Defendant further contends "[i]t was also error/abuse of discretion for the court to prevent [him] from explaining the reasons for his silence when he testified."  Because we conclude both the trial court and the prosecutor committed prejudicial error when it instructed the jury with CALCRIM No. 357, and informed the jury it could use defendant's silence as evidence of guilt, we do not address this additional claim.

12.

the jury being instructed with CALCRIM No. 357.  Accordingly, defendant has preserved the issue on appeal and, thus, we address the merits of his claim.

## A. Additional Factual Background

On January 15, 2020, Detective Vasquez arrested defendant.  Prior to arresting defendant, Vasquez spoke with defendant.  Per the full transcript of the conversation, there was a brief discussion between the two of them before Vasquez provided defendant with *Miranda* warnings.  Later on, defendant invoked his right to counsel.  The trial court subsequently excluded everything that was said before the *Miranda* warnings were given, and everything that was said after the invocation of counsel, including the invocation itself.  The following exchange was admitted into evidence as People's exhibit No. 9:

> "[DETECTIVE] VASQUEZ:  You're in custody so I'm going to read you your rights all right?  You have the right to remain silent.  Anything you say can and will be used against you in a court of law.  You have the right to talk to a lawyer and have him present with you while you're being questioned.  If you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning if you wish.  You could decide at any time to exercise these rights and not answer any questions or make any statements.  You understand?  I need a verbal yes or no.
>
> "[DEFENDANT]:  Uh-huh.
>
> "[DETECTIVE] VASQUEZ:  Thank you sir.  How long were you with Amy?  [O]r your booty call?  Whatever relationship you guys had, bro.  I want to make sure you get your side of the story too, right?
>
> "[DEFENDANT]:  I—
>
> "[DETECTIVE] VASQUEZ:  Right?
>
> "[DEFENDANT]:  I don't know.  I don't know what this is about.
>
> "[DETECTIVE] VASQUEZ:  I tried calling you.  I tried calling you that night.  Okay?
>
> "[DEFENDANT]:  Tried calling me?

13.

"[DETECTIVE] VASQUEZ: Yes. I tried calling you and it went to voicemail and I got that number, the same number you text the grandpa of [A.P.] and you said, 'Hey, is everything that's being said true?'

"[DEFENDANT]: Yeah, because I—

"[DETECTIVE] VASQUEZ: So obviously you know, bro. You know what the hell is going on. You're not dumb. I'm not trying to say you're dumb, but you know exactly what the hell we're talking about. Right?

"[DEFENDANT]: No.

"[DETECTIVE] VASQUEZ: Well, you tell me your version then. You tell me your version.

"[DEFENDANT]: Version of what?

"[DETECTIVE] VASQUEZ: Of this whole ordeal from the get-go man.

"[DEFENDANT]: I… Man this…

"[DETECTIVE] VASQUEZ: Are you at all sorry for doing what you did to [A.P.]? Huh?

"[DETECTIVE] VASQUEZ: Is it true, yeah or no?

"[DETECTIVE] VASQUEZ: Is it true or no?

"[UNKNOWN SPEAKER]: The door was open.

"[DETECTIVE] VASQUEZ: Yours was?

"[UNKNOWN SPEAKER]: Yeah, my passenger door was open.

"[DETECTIVE] VASQUEZ: Uh-huh. Is it true bro?"[11] (Capitalization added.)

Subsequently, during the jury instruction conference, the prosecutor requested an instruction on adoptive admissions pursuant to CALCRIM No. 357. The trial court

[11] This is a transcript of the audio recording of defendant's interrogation, which was marked as People's exhibit No. 9. The transcript, which is reflected in this opinion, was premarked as People's exhibit No. 9A. The redacted audio version of the interrogation was played for the jury.

responded, "[T]here are a number of times within that interview where the Detective is making statements, um, that is clear that the defendant heard and was standing right there, was made in the defendant's presence … [and] under regular circumstances, naturally would have denied it, and he did not." Trial counsel objected to the instruction. The trial court agreed to provide the jury with CALCRIM No. 357 and stated the following in relevant part:

> " … All right. Well, in terms of—well, I'm not sure if he heard the officer asked him multiple times, multiple times the same thing, and he still didn't say anything, and as the Court indicated, it definitely appears to the Court the statement was made to defendant, the defendant heard or understood the statement, he's standing right next to the officer, uh, the defendant would, under all circumstances, naturally have denied the statement had he thought it was not true, and the defendant could have denied it but did not." [¶] … [¶]

> "So the Court, in looking at that, um, series of questions and what appear[s] to be inability or refusal to deny it, uh, as far as the Court's concerned, meet the elements of an adoptive admission, and the Court is going to give the adoptive admission under [CALCRIM No.] 357."

The trial court then instructed the jury with CALCRIM No. 357:

> "If you conclude that someone made a statement outside of court that accused the defendant of the crime or tended to connect the defendant with the commission of the crime and the defendant did not deny it, you must decide whether each of the following is true:

> "Number one, the statement was made to the defendant or made in his presence;

> "[N]umber two, the defendant heard and understood the statement;

> "[N]umber three, the defendant would, under all circumstances, naturally have denied the statement if he thought it was not true;

> "[A]nd number four, the defendant could have denied it but he did not.

"If you decide that any of these requirements have not been met, you must not consider either the statement or the defendant's response for any purpose."[12]

## B. Applicable Law

The Fifth Amendment to the United States Constitution provides that "[n]o person … shall be compelled in any criminal case to be a witness against himself .…"  To safeguard a suspect's Fifth Amendment privilege against self-incrimination from the "inherently compelling pressures" of the custodial setting (*Miranda*, *supra*, 384 U.S. at p. 467), the high court adopted a set of prophylactic measures requiring law enforcement officers to advise a suspect of his right to remain silent and to have counsel present prior to any custodial interrogation (*id*. at pp. 444–445).

As stated above, "[i]n *Doyle*, the United States Supreme Court held that it was a violation of due process and fundamental fairness to use a defendant's postarrest silence following *Miranda* warnings to impeach the defendant's trial testimony.  (*Doyle*, *supra*, 426 U.S. at pp. 617–618.)"  (*People v. Collins* (2010) 49 Cal.4th 175, 203 (*Collins*); see *People v. Earp* (1999) 20 Cal.4th 826, 856.)  "Post-arrest silence also may not be used against a defendant at trial in order to imply guilt from that silence."  (*Stone v. United States* (6th Cir. 2007) 258 Fed.Appx. 784, 787, citing to *Doyle, supra*, at p. 611.)  "The Supreme Court has explained the rationale of this holding in these terms:  '[The] use of silence for impeachment [is] fundamentally unfair … because "*Miranda* warnings inform a person of his right to remain silent and assure him, at least implicitly, that his silence will not be used against him.…  *Doyle* bars the use against a criminal defendant of silence maintained after receipt of governmental assurances."'"  (*People v. Evans* (1994) 25 Cal.App.4th 358, 367; see *People v. Hurd* (1998) 62 Cal.App.4th 1084, 1092 (*Hurd*).)

---

**12**    Both the written and oral versions of CALCRIM No. 357 provided to the jury were missing a key phrase from the standard instruction.  The missing phrase is as follows:  "If you decide that all of these requirements have been met, you may conclude that the defendant admitted the statement was true" (CALCRIM No. 357).

"The prosecutor cannot use the defendant's invocation of his right to remain silent or refusal to answer questions as evidence against him. [Citations.] Particularly, the defendant's silence may not be used to impeach his credibility. [Citations.] [¶] To establish a violation of due process under *Doyle*, the defendant must show that the prosecution inappropriately used his postarrest silence for impeachment purposes and the trial court permitted the prosecution to engage in such inquiry or argument." (*People v. Champion* (2005) 134 Cal.App.4th 1440, 1448.) "'To assess whether these questions constitute *Doyle* error, we ask whether the prosecutor referred to the defendant's post-arrest silence so that the jury would draw "inferences of guilt from [the] defendant's decision to remain silent after … arrest."'" (*People v. Hollinquest* (2010) 190 Cal.App.4th 1534, 1556 (*Hollinquest*), quoting *Smith v. Jones* (6th Cir. 2009) 326 Fed.Appx. 324, 330.)

"Evidence of a statement offered against a party is not made inadmissible by the hearsay rule if the statement is one of which the party, with knowledge of the content thereof, has by words or other conduct manifested his adoption or his belief in its truth." (Evid. Code, § 1221.) "The statute contemplates either explicit acceptance of another's statement or acquiescence in its truth by silence or equivocal or evasive conduct." (*People v. Combs* (2004) 34 Cal.4th 821, 843.) Generally speaking, "'[w]hen a person makes a statement in the presence of a party to an action under circumstances that would normally call for a response if the statement were untrue, the statement is admissible for the limited purpose of showing the party's reaction to it. [Citations.] His silence, evasion, or equivocation may be considered as a tacit admission of the statements made in his presence.'" (*People v. Riel* (2000) 22 Cal.4th 1153, 1189, quoting *Estate of Neilson* (1962) 57 Cal.2d 733, 746.)

However, as noted above, "the Fifth Amendment … forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt." (*Griffin, supra*, 380 U.S. at p. 615, fn. omitted.) "The rationale of

17.

*Griffin* implicitly proscribes drawing an inference adverse to the defendant from his failure to reply to an accusatory statement if the defendant was asserting his constitutional privilege against self-incrimination." (*People v. Cockrell* (1965) 63 Cal.2d 659, 669–670.) For Evidence Code section 1221 to apply, the circumstances cannot "'lend themselves to an inference that he was relying on the right of silence guaranteed by the Fifth Amendment to the United States Constitution .…'" (*People v. Riel, supra*, 22 Cal.4th at p. 1189.)[13] Therefore, "[w]here a defendant's failure to reply is based on his constitutional right to remain silent, instructing the jury that it can treat the failure to reply as an adoptive admission violates the Fifth Amendment." (*Arnold v. Runnels* (9th Cir. 2005) 421 F.3d 859, 869.)

## C. Analysis

Defendant argues a prejudicial *Doyle/Griffin* error occurred when the jury was improperly instructed it could use his post-*Miranda* silence against him, and that the prosecutor committed error when she argued the jury was permitted to draw an inference of guilt from that silence.[14] We agree.

---

[13] Although at least one federal court appears to have placed a blanket prohibition on the use of a defendant's post-*Miranda* silence because such silence "is 'insolubly ambiguous .…'" (*Franklin v. Duncan* (N.D.Cal. 1995) 884 F.Supp. 1435, 1447 (9th Cir. 1995) 70 F.3d 75), the California Supreme Court has not drawn such a bright line rule (see *People v. Medina* (1990) 51 Cal.3d 870, 890–891 (*Medina*), affd. *Medina v. California* (1992) 505 U.S. 437, 453). The *Medina* court held the Fifth Amendment's right to silence was not implicated because the "record d[id] not suggest that [the] defendant believed his conversation with his sister was being monitored, or that his silence was intended as an invocation of any constitutional right." (*Medina, supra*, at p. 890.) However, the court did not address "the situation in which an in-custody, *Mirandized*, suspect is confronted with an accusatory statement in circumstances where he may be presumed to suspect the monitoring of his conversation" and "d[id] not decide whether, in such circumstances, application of the adoptive admissions rule would be unfair, essentially requiring the defendant to respond to avoid an adverse inference of guilt if he remains silent." (*Id*. at p. 891.)

[14] We do not address the People's argument as to whether defendant expressly or implicitly waived his *Miranda* rights because, as we discuss in detail below, irrespective of a valid waiver, defendant maintained his right to remain silent throughout the interrogation.

"After a defendant waives his or her *Miranda* rights, the police are free to interrogate until the defendant invokes his or her Fifth Amendment right to silence." (*Hurd*, *supra*, 62 Cal.App.4th at p. 1090.)  "A defendant may invoke his or her Fifth Amendment right to silence by refusing to continue an ongoing interrogation subsequent to waiving that right."  (*Ibid.*)  As *Doyle* makes clear:

> "'When a person under arrest is informed, as *Miranda* requires, that he may remain silent, that anything he says may be used against him, and that he may have an attorney if he wishes, it seems to me that it does not comport with due process to permit the prosecution during the trial to call attention to his silence at the time of arrest and to insist that because he did not speak about the facts of the case at that time, as he was told he need not do, an unfavorable inference might be drawn as to the truth of his trial testimony.…  Surely [the defendant] was not informed here that his silence, as well as his words, could be used against him at trial.  Indeed, anyone would reasonably conclude from *Miranda* warnings that this would not be the case.'"  (*Doyle*, *supra*, 426 U.S. at p. 619, fn. omitted, quoting *United States v. Hale* (1975) 422 U.S. 171, 182–183 (conc. opn. of White, J.).)

Because "every post-arrest silence is insolubly ambiguous," we presume that "[s]ilence in the wake of these [*Miranda*] warnings may be nothing more than the arrestee's exercise of these *Miranda* rights."  (*Doyle*, *supra*, 426 U.S. at p. 617.)

At the outset, defendant's post-*Miranda statements* to Detective Vasquez were admissible as opposing party statements pursuant to Evidence Code section 1220.  (See *Miranda, supra*, 384 U.S. at p. 478 ["Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence."].)  However, the trial court violated both *Doyle* and *Griffin* when it instructed the jury with CALCRIM No. 357, which permitted the jury to use defendant's silence as substantive evidence of guilt.  (*Doyle, supra*, 426 U.S. at pp. 617–618; *Griffin, supra*, 380 U.S. at p. 615.)  The People argue this is a case where defendant failed to unambiguously invoke his right to silence after a *Miranda* waiver and, thus, his silence could be used against him.  However, the People improperly conflate *Miranda*, which focuses on police interrogation tactics, and the Fifth Amendment's absolute right to remain silent.  *Miranda* is a

19.

prophylactic rule, rooted in the Fifth Amendment, that prevents *law enforcement* from interrogating an in-custody suspect, who after a valid *Miranda* waiver, unequivocally invokes either their right to remain silent or their right to counsel. (See *Berghuis*, *supra*, 560 U.S. at p. 381 [holding that after a suspect has been provided the *Miranda* advisements, law enforcement must cease questioning only after the suspect "invoke[s] his or her right to remain silent … unambiguously"]; *Davis, supra*, 512 U.S. at p. 459 [after being provided with the *Miranda* advisements, a suspect must invoke the *Miranda* right to counsel "unambiguously"].) Unlike *Miranda*, which requires custodial interrogation to apply, the Fifth Amendment's prohibition against self-incrimination, i.e. the right to remain silent, is constant and applies to both custodial and noncustodial situations. This is best illustrated by two distinct examples. In the first example, a suspect is brought into an interrogation room in handcuffs, provided their *Miranda* rights, waives these rights, and is then questioned by law enforcement about a crime. If the suspect makes incriminating statements, these statements are admissible because they were made *after* a *Miranda* waiver was provided. Therefore, law enforcement must cease questioning *only* after the suspect unambiguously invokes either their right to remain silent or right to counsel. These statements are admissible even if they occur after two hours of constant silence. A *Miranda* violation occurs if law enforcement continues its questioning *after* the suspect unambiguously invokes.

In contrast, in the second example, a suspect is brought into an interrogation room in handcuffs, provided their *Miranda* advisements, waives these rights, and is then questioned by law enforcement. In this example, the suspect chooses *not* to engage with law enforcement and instead remains mostly silent. The suspect need not invoke his right to remain silent because it is presumed the individual is simply acting upon their Fifth Amendment right to remain silent when they choose not to speak or answer questions. (*Doyle, supra*, 426 U.S. at pp. 617–618.) Although the suspect chooses to remain silent, law enforcement does not violate *Miranda* by continuing to ask questions and, in fact,

20.

any subsequent statements made by the suspect after any continued silence are admissible. (See *Berghuis, supra*, 560 U.S. at pp. 379–381 [our Supreme Court held that in the context of post-*Miranda* silence, a defendant's confession was admissible because he failed to invoke the privilege when he refused to respond to police questioning for two hours and 45 minutes].) Although the defendant's post-*Miranda statements* are admissible in court, a jury cannot use the defendant's *silence* as substantive evidence of guilt.

Here, the trial court violated both *Doyle* and *Griffin* when it instructed the jury with CALCRIM No. 357. We find the Ninth Circuit's holding in *Hurd v. Terhune* (9th Cir. 2010) 619 F.3d 1080 (*Terhune*) instructive. In *Terhune*, the Ninth Circuit Court of Appeals granted the defendant's writ of habeas corpus because "the state trial court improperly admitted as evidence his refusal to reenact the shooting in violation of his Fifth Amendment rights ….." (*Id.* at p. 1085.) Specifically, *Terhune* stated the following:

> "[*Berghuis*] makes clear that a criminal defendant must affirmatively and unambiguously invoke his right to remain silent if he wishes to cut off police interrogation. [Citation.] When a suspect remains 'largely silent' in response to officers' questions, the interrogation does not automatically have to cease. [Citation.] At the same time, when a defendant remains silent or refuses to answer a question posed by police, that silence or refusal is inadmissible. As the Court held in *Doyle*, a defendant's silence in response to a question is ambiguous because it may be no more than a reliance on the right to silence. [Citations.] That silence may not require police to end their interrogation, but it also does not allow prosecutors to use silence as affirmative evidence of guilt at trial. [*Berghuis*] stands for the proposition that a voluntary confession should not be suppressed just because a defendant has refrained from answering other questions. [Citation.] It does not alter the fundamental principle that a suspect's silence in the face of questioning cannot be used as evidence against him at

21.

trial, whether that silence would constitute a valid invocation of the 'right to cut off questioning' or not." (*Terhune, supra*, 619 F.3d at p. 1088.)[15]

Similarly here, the only answers defendant provided to Vasquez were denials, which as we noted above, were admissible as opposing party statements.[16]  However, his statements were not only introduced to the jury as evidence of guilt, but also his silence. Although "[t]hat silence [did] not require [Vasquez] to end [his] interrogation" (*Terhune, supra*, 619 F.3d at p. 1088), it was improper for the trial court to instruct the jury "that such silence is evidence of guilt." (*Griffin, supra*, 380 U.S. at p. 615, fn. omitted.)

The trial court improperly instructed the jury it could consider defendant's silence to Vasquez as an adoptive admission if they concluded:  (1) "that someone made a statement outside of court that accused the defendant of the crime or tended to connect the [d]efendant with the commission of the crime"; (2) "[t]he statement was made to the defendant or made in his presence"; (3) "[t]he defendant heard and understood the statement [¶] [and] would, under all the circumstances, naturally have denied the statement if he thought it was not true"; and (4) "[t]he defendant could have denied it but did not."  The jury was instructed it could use defendant's silence, in response to Vasquez's accusations, as substantive evidence of guilt.  Because this instruction permitted the jury to use defendant's *silence* as evidence of guilt, this instruction violated defendant's Fifth Amendment right to remain silent, as articulated in both *Doyle* and *Griffin*.

---

**15**    In contrast, the Court of Appeal, held that "[a] defendant has no right to remain silent selectively [and] [o]nce a defendant elects to speak after receiving a *Miranda* warning, his or her refusal to answer questions may be used for impeachment purposes absent any indication that such refusal is an invocation of *Miranda* rights." (*Hurd, supra*, 62 Cal.App.4th at p. 1093.)  As discussed in detail above, the Ninth Circuit disagreed and concluded, "The California Court of Appeal's *Miranda* and *Doyle* analysis is incorrect." (*Terhune, supra*, 619 F.3d at p. 1087, fn. omitted.)

**16**    Although defendant's statements were admissible as opposing party admissions, it is questionable whether his minimal responses to Vasquez's questioning would even satisfy the relevancy requirement.  (See Evid. Code, § 350.)

Nonetheless, the People contend that "*Doyle* is inapplicable absent invocation of the right to remain silent" (boldface omitted), which did not happen in this case. Specifically, the People argue "where a suspect has not invoked his right to remain silent, the [United States] Supreme Court has held that *Doyle* does not apply." In support of this proposition, the People refer this court to both the United States Supreme Court's decision in *Anderson v. Charles* (1980) 447 U.S. 404 (*Anderson*) and our Supreme Court's decision in *Collins*.

In *Anderson*, the defendant was arrested while driving a stolen car. (*Anderson, supra*, 447 U.S. at p. 404.) Detectives interviewed the defendant and provided him *Miranda* warnings. (*Id*. at p. 405.) The detective "asked [the defendant] about the stolen automobile … [and he] said that he stole the car … about two miles from the local bus station." (*Ibid*.) The defendant testified on his own behalf and stated he took the unattended vehicle from a different parking lot. (*Ibid*.) On cross-examination, the prosecutor asked a general question regarding why the defendant at the time of the arrest did not tell anybody where he stole the automobile. (*Id.* at pp. 405–406.) The prosecutor then asked the defendant why he told the arresting officer a different story. (*Id*. at p. 406.) The *Anderson* court concluded that *Doyle* did not apply to this case. (*Anderson, supra*, at pp. 407–409.) Specifically, the court stated the following:

> "*Doyle* bars the use against a criminal defendant of silence maintained after receipt of governmental assurances. But *Doyle* does not apply to cross-examination that merely inquires into prior inconsistent statements. Such questioning makes no unfair use of silence *because a defendant who voluntarily speaks after receiving Miranda warnings has not been induced to remain silent.* As to the subject matter of his statements, the defendant has not remained silent at all." (*Anderson, supra*, 447 U.S. at p. 408, italics added.)

Additionally, in *Collins*, the defendant argued "the prosecutor committed error under *Doyle* …, during her cross-examination … and in her guilt phase argument [and] [s]pecifically, defendant complain[ed] the prosecutor improperly questioned his failure to

23.

inform the police or prosecutor of his alibi before trial." (*Collins, supra*, 49 Cal.4th at p. 199.) The prosecutor questioned the defendant about his failure to reveal an alibi to a detective and commented on the defendant's failure to raise the alibi in her closing argument. (*Id*. at pp. 199–202.) The *Collins* court held the prosecutor did not violate *Doyle* because the "[d]efendant was not 'silent' on his whereabouts at the time of the murder[] [and] he chose to provide varied explanations that differed from his trial testimony." (*Id*. at p. 204.) Further, "the prosecutor's questions regarding [the] defendant's failure to come forward earlier with his alibi were asked in the context of those interview statements [and, thus,] [t]he questions were a legitimate effort to elicit an explanation as to why, if the alibi were true, [the] defendant did not provide it earlier." (*Ibid*.) "As such, neither the questions nor the prosecutor's remarks in closing argument were 'designed to draw meaning from silence.'" (*Ibid*., quoting *Anderson, supra*, 447 U.S. at p. 409.)

Both *Anderson* and *Collins* reiterate the proposition that "a defendant who voluntarily speaks after receiving *Miranda* warnings has not been induced to remain silent." (*Anderson, supra*, 447 U.S. at p. 408.) Any statements made post-*Miranda* warnings are admissible because the suspect is not relying on his or her right to remain silent if they willingly choose to speak with law enforcement. As stated above, the prosecutor in this case had every right to impeach defendant's testimony with his prior statements or refer to these statements during her closing and rebuttal arguments. Instead, the trial court improperly instructed the jury that defendant's *silence*, in addition to his prior statements, could be used to support guilt, and the prosecutor improperly argued during both her closing and rebuttal arguments his silence was evidence of guilt, in violation of both *Doyle* and *Griffin*.

## D.  Prejudice

We now turn our focus to an examination of the prejudicial impact of the admission and jury instruction regarding defendant's silence, and the prosecutor's use of

his silence during her closing argument in violation of *Doyle* and *Griffin*. "The test of prejudice is the standard enunciated in *Chapman v. California* (1967) 386 U.S. 18, 24: we must reverse the judgment unless beyond a reasonable doubt the error complained of did not contribute to the verdict." (*Hollinquest, supra*, 190 Cal.App.4th at p. 1558, citing *People v. Waldie* (2009) 173 Cal.App.4th 358, 366; accord, *People v. Champion, supra*, 134 Cal.App.4th at p. 1453; *United States v. Williams* (9th Cir. 2006) 435 F.3d 1148, 1163.) As this court stated in *People v. Galloway* (1979) 100 Cal.App.3d 551 (*Galloway*), "prejudice is demonstrated (1) if the evidence against [the] defendant is less than overwhelming, and (2) if the improper comment[s] touched 'a live nerve in the [appellant's] defense'" (*id.* at p. 560, quoting *People v. Modesto* (1967) 66 Cal.2d 695, 714, disapproved on another ground in *Maine v. Superior Court* (1968) 68 Cal.2d 375, 383, fn. 8), and "reach[ed] the proportions of 'machine-gun repetition .…'" (*Galloway, supra*, at p. 560.)

Here, we are unable to conclude beyond a reasonable doubt the errors committed by both the trial court and the prosecutor did not contribute to the jury's verdict. First, the evidence against defendant was "less than overwhelming." (*Galloway, supra*, 100 Cal.App.3d at p. 560.) In a sexual assault case, such as this one, the evidence of guilt primarily depended on the testimony and statements by A.P. (See generally *People v. Avila* (2014) 59 Cal.4th 496, 515 ["'By their very nature, sex crimes are usually committed in seclusion without third party witnesses or substantial corroborating evidence. The ensuing trial presents conflicting versions of the event and requires the trier of fact to make difficult credibility determinations.'"].) Apart from the evidence regarding A.P.'s erratic and sexual behavior during her third and fourth grade years, this case lacked other corroborating evidence. This trial was essentially a credibility contest between defendant and A.P.

Second, because of this lack of corroborating evidence, the prosecutor drew the jury's attention to defendant's silence during both her closing and rebuttal arguments,

25.

which made this evidence even more prejudicial. (See *Griffin, supra*, 380 U.S. at p. 615.) "'When deciding whether a prosecutor's reference to a defendant's post-arrest silence was prejudicial, this court will consider the extent of comments made by the witness, whether an inference of guilt from silence was stressed to the jury, and the extent of other evidence suggesting [the] defendant's guilt.'" (*United States v. Lopez* (9th Cir. 2007) 500 F.3d 840, 845.) We find the Ninth Circuit's decision in *Guam v. Veloria* (9th Cir. 1998) 136 F.3d 648 (*Veloria*) instructive. In *Veloria*, "[t]he government presented convincing evidence … that the three-year-old child had suffered injuries to her vaginal area which were consistent with sexual assault," however, "[t]he evidence as to the perpetrator was circumstantial and required the jury to weigh the credibility of the mother against the defendant." (*Id* at p. 650.) During the prosecutor's case-in-chief, "[t]he prosecutor impermissibly elicited testimony about [the defendant's] post-arrest silence." (*Id*. at p. 652.) Although the government argued "the prosecutor made no further reference to [the defendant's] post-arrest silence," the court found prejudice because "the jury was never cautioned or instructed to disregard [the officer's] testimony regarding the defendant's post-arrest silence" and "the evidence that the defendant committed this crime was simply a question of credibility—the defendant's word against that of his former girlfriend, who reported the crime … [and] [t]he only evidence other tha[n] her testimony that implicated [the defendant] was the officer's testimony regarding [the defendant's] post-arrest silence." (*Id*. at pp. 652, 653.) Therefore, "[c]onsidering all factors, the improper reference to [the] defendant's silence was prejudicial enough to affect the outcome of the proceedings." (*Id*. at p. 653.)

The prosecutor's reference to defendant's silence in this case was even more egregious than that of the prosecutor in *Veloria*. The prosecutor argued at the end of her closing argument the following:

> "Now, one of the last instructions I want to talk to you about is [CALCRIM No.] 357. It's called, 'Adoptive admissions.' And this goes to

26.

that recording that the defendant had with Detective Vasquez. And it says this, 'If you conclude that someone made a statement outside of court that accused the defendant of the crime or tended to connect the defendant with the commission of the crime, and the defendant did not deny it, you must decide whether each of the following is true: One, the statement was made to the defendant or made in his presence.' We know that this was made to the defendant. Detective Vasquez was right next to him. 'The defendant heard and understood the statement.' You heard the recording. It was extremely clear, and the defendant had understood all of the other things that detective had asked him. 'Three, the defendant would, under all the circumstances, naturally have denied the statement if he thought it was not true.' He was asked four different times about whether or not he molested [A.P.], and ne never denied it. 'And four, the defendant could have denied it but did not.' You all heard the moments of glaring silence after those questions were asked on that—on that recording. The first question, 'Do you feel bad for what you did to [A.P.]?' Huge amount of time. And then asked 'Is it true?' Huge amount of time. And that happened three different times. The defendant who had been talking to Detective Vasquez had every opportunity to say, 'No, it's not true.' Anyone who had not molested a child and was being asked if they molested a child would say, 'No, it's not true.' And the law tells you that you can consider this. And lastly, 'If you decide that any of these requirements has not been met, you must not consider either the statement or the defendant's response for any purpose.' But they have been met. These four requirements are all very clearly met, and the defendant chose not to deny the allegations that were very specific, um, and that were caught on tape."

Subsequently, at the end of the prosecutor's rebuttal argument, she argued the following:

"And the last thing I'd like to talk about is this concept of adoptive admissions. We've spent a lot of times talking about [A.P.] and how her behavior supports that this is what happened. But the defendant also told us in his interview with Detective Vasquez, um, essentially, that he was not willing to deny what had happened. [¶] … [¶] In this recording that we got to hear that was part of the evidence, the defendant was asked four different questions. During a silence that gave him ample time to respond to questions that any reasonable person would have responded with a denial, the defendant chose not to say anything. He did not deny the allegations. He participated in other parts of the conversation wherein he answered questions. You know that he heard the questions. Detective Vasquez stated that this was an appropriate recording. The defendant was asked if he felt bad about what he did to [A.P.]. He said nothing. He was asked if it was true. Again, he said nothing. Twice more he was asked if it was true,

27.

and he said nothing. Four opportunities to make a denial when asked specifically, 'Is this true? Did you do this? Are these allegations correct.' And he chose not to deny. I'd like you to listen to the audio one more time.

"(Thereupon an audio recording was played, not reported.)

"… The defendant was asked four different questions, three times if it was true, and once if he felt bad for what he did to [A.P.]. Each of those was followed by a pause of 10 to 15 to 20 seconds of silence, during which time anyone—a reasonable person who had been asked those questions would have said, 'No, it's not true.' And the law tells you that that can be considered an adoptive admission. He had the right to remain silent, yes. But he was participating in the other questions that were being asked of him. He did not respond when asked if it was true or not true, when he had an opportunity to say, 'No, I did not do this. I did not molest [A.P.]. This did not happen.' He chose not to say anything at all. And based on that—combining that with everything else that we know about [A.P.] about [A.P.'s] full sexual assault and everything we heard from her, I put before you, and I ask you to find the defendant guilty of Counts One through Four. Thank you."

The prosecutor used defendant's silence as a pivotal part of her case. This repeated reference to defendant's silence, during both her closing and rebuttal arguments, represented a type of "'machine-gun repetition ….'" (*Galloway, supra*, 100 Cal.App.3d at p. 560.) Because weighing credibility was the ultimate issue for the jury to consider (see *People v. Miranda* (2011) 199 Cal.App.4th 1403, 1426 [this case involves "the typical scenario of a one-on-one sexual assault, in which victim credibility is often determinative"]; see also *Veloria, supra*, 136 F.3d at pp. 652–653), *any* corroborating evidence of guilt was vitally important. Defendant's silence, which the jury was instructed could be used to support his guilt, carried with it an imprimatur of guilt. In this he-said, she-said type case, the jury could feel confident in finding defendant guilty when it was told it could use defendant's silence as an admission of guilt to corroborate the accusations made against him. The prosecutor knew how important defendant's silence was to her case because it represented one of the few pieces of corroborating evidence. In fact, it is arguable defendant's silence was the most important piece of evidence, which

28.

is why the prosecutor drove this point home to the jury by strategically referencing his silence at the end of both her closing and rebuttal arguments. (See generally *People v. McDaniel* (2019) 38 Cal.App.5th 986, 1008, fn. omitted ["Thus, harnessing the instruction on adoptive admissions, the prosecutor was able to argue that [the defendant] had effectively confessed to committing the [crimes]. In doing so, she lobbed into the case ""[the] kind of evidentiary bombshell [that] shatters the defense.""""].)

Finally, it appears from the record that trial counsel's entire defense rested on the fact this case lacked corroborating evidence and, thus, depended primarily on the credibility of defendant and A.P. Specifically, at the end of trial counsel's closing argument, she argued the following:

> "And I trust, and I hope that when you deliberate, you will think about, like I said, this isn't an exhaustive list, these are just some things [the prosecutor is] looking to ignore, that there is no evidence of physical trauma—physical sexual trauma to [A.P.], no evidence of these photos, no evidence of those videos. [Defendant] never fled. He stayed. He stayed in the county. He stayed in the state. And then he has a reputation for good moral character when it comes to sexual—when it comes to matters of—sexual matters involving minors. [The prosecutor] want[s] you [to] accept some of the things [A.P.] said and ignore others. [¶] … [¶] … When [A.P.] asked— and maybe it wasn't very clear, I think you read it in the transcripts, 'I lied,' and then she says, 'I'm sorry, just kidding, just kidding. I wanted to prank you.' This is not a joking matter. This is some serious stuff. And she's a child, I get it, I get it. I understand that, but those are things that you've got to keep in mind when you're deliberating."

Trial counsel focused on A.P.'s credibility issues. Her entire defense was predicated on the theory that A.P. was fabricating the entire story, and that this case lacked corroborating evidence, such as "physical sexual trauma" and "videos." Therefore, evidence that defendant himself admitted to sexually assaulting A.P. completely negated trial counsel's entire defense strategy. (See *People v. St. Andrew* (1980) 101 Cal.App.3d 450, 465 [when "The case is a close one, turning primarily upon the respective credibility of the … principal witnesses … "'any substantial error tending to discredit the defense, or

to corroborate the prosecution, must be considered as prejudicial.""""].) Accordingly, defendant was prejudiced by this error.

Nonetheless, the People contend defendant is unable to establish prejudice because the trial court "omitted the critical phrase that would have instructed the jurors as to how they could use an adoptive admission" and, therefore, the instruction "had no teeth and was essentially useless." We disagree.

As noted above, both the written and oral versions of CALCRIM No. 357 provided to the jury were missing a key phrase from the standard instruction. The missing phrase was as follows: "If you decide that all of these requirements have been met, you may conclude that the defendant admitted the statement was true." (CALCRIM No. 357.) Although the trial court's omission of this language may have benefitted defendant (see *People v. Covarrubias* (2016) 1 Cal.5th 838, 932 ["Under these circumstances, any failure to instruct on causation could only have inured to [the] defendant's benefit."]), it still did not remove the probability the jury used his silence as an adoptive admission. The jury was still instructed it could use defendant's silence as evidence of guilt if it concluded all four elements of the adoptive admission instruction were met. It was clear these elements had been met based on Vasquez's testimony and the interrogation recording.

With that being said, any *potential* ambiguity in the CALCRIM No. 357 instruction was removed by the prosecutor during her closing and rebuttal arguments. As stated above, the prosecutor clearly spelled out how the jury was to apply CALCRIM No. 357. She told the jury "[a]nyone who had *not* molested a child and was being asked if they molested a child would say, 'No, it's not true' … and the defendant chose not to deny the allegations that were very specific … and that were caught on tape." (Italics added.) Before concluding her rebuttal argument, the prosecutor again reminded the jury, "*He chose not to say anything at all*. And based on that—combining that with everything else that we know about [A.P.,] about [A.P.'s] full sexual assault and everything we

30.

heard from her, I put before you, and I ask you to find the defendant guilty of Counts One through Four. Thank you." (Italics added.) Defendant's silence, in the face of Vasquez's questioning, was the final piece of evidence the jury heard before deliberating. Therefore, even assuming we accept the People's argument that the CALCRIM No. 357 instruction provided to the jury "gave the jurors no direction as to how they were to use the evidence," the prosecutor provided plenty of direction on how to apply this instruction during both her closing and rebuttal arguments. Accordingly, based on the jury being instructed with CALCRIM No. 357, coupled with the prosecutor's repeated reference to his silence during his interrogation, we are forced to conclude the *Doyle* and *Griffin* errors committed by both the trial court and prosecutor were prejudicial because we are unable to find "beyond a reasonable doubt the error complained of did not contribute to the verdict" and, thus, the conviction must be reversed. (*Hollinquest, supra*, 190 Cal.App.4th at p. 1558.)

## II.      Other Claims

Defendant raised several other claims in this appeal. He contends the trial court erred when it: (1) permitted A.P. to testify via one-way closed circuit television, in violation of his confrontation rights, as guaranteed by the Sixth Amendment to the federal Constitution; (2) forced him to be the only individual in the courtroom required to wear a COVID-19 mask in violation of his right to face-to-face confrontation; (3) "addressed [defendant] by name and asked him if he wore glasses when he knew [A.P.]" because "[i]t forced him to admit that he knew [A.P.], which thereby established that he was the [individual] that [A.P.] named in her testimony as her abuser" in violation of his Fifth Amendment right against self-incrimination; (4) allowed evidence of A.P.'s PTSD diagnosis as substantive evidence of sexual abuse, which is foreclosed by *People v. Bledsoe* (1984) 36 Cal.3d 236 and its progeny; and (5) instructed the jury with CALCRIM No. 1193 because "[t]he last sentence of [the instruction] is ambiguous in a manner that makes it erroneously misleading" in that "the double-negative phrase 'not

31.

inconsistent' can be read to mean 'consistent,'" which permitted the jury "to conclude that [A.P.'s] claim of abuse is more believable because her subsequent conduct was *consistent* with the conduct of someone who has been molested … tend[ing] to prove that she was molested." Additionally, defendant contends the prosecutor committed misconduct when she repeatedly violated the motion in limine instruction limiting the use of CSAAS evidence. Finally, defendant contends the prosecutor committed misconduct when she "exploited the ambiguity in CALCRIM No. 1193 by arguing in summation that the instruction permitted the jury to use PTSD and CSAAS evidence as affirmative evidence of abuse and … urg[ed the] jury to do so." Alternatively, in the event this argument is forfeited by trial counsel's failure to object, he contends he received ineffective assistance of counsel. Because we are reversing the entirety of the judgment, we do not reach these additional claims.

## DISPOSITION

The judgment is reversed.


                                                                MEEHAN, J.

WE CONCUR:


DETJEN, Acting P. J.


FRANSON, J.


32.